[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Myers,* Slip Opinion No. 2018-Ohio-1903.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-1903

THE STATE OF OHIO, APPELLEE, *v*. MYERS, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Myers,* Slip Opinion No. 2018-Ohio-1903.]

*Criminal Law—Aggravated murder—Convictions and death penalty affirmed.*

(No. 2014-1862—Submitted December 5, 2017—Decided May 17, 2018.)

APPEAL from the Court of Common Pleas of Warren County, No. 14CR29826.

_____

DEWINE, J.

{¶ 1} This is a direct appeal in a capital case. Austin Myers was convicted of aggravated murder with a death specification for killing his childhood friend Justin Back. We affirm his convictions and the imposition of the death penalty.

I. BACKGROUND

A. Planning and Preparation

{¶ 2} The case was tried to a jury. Much of the account of what happened came from Myers's friend and codefendant Timothy Mosley. According to Mosley, he and Myers began to concoct their scheme on January 27, 2014. That morning, Myers, who had just slept through the start of a new job, woke up Mosley

and asked him if he "wanted to make some money." When Mosley said he did, Myers suggested that they either rob a drug dealer he knew or "Justin Back's step dad, Mark [Cates]." Myers had once lived near Back's family. He and Back had attended seventh and eighth grades together and briefly had been friends until Back's mother told him he could no longer be around Myers. Myers had been in Back's home and told Mosley that Cates had a safe containing a gun and money that was "usually cracked open."

{¶ 3} Later that day, with Myers giving directions, Mosley drove them to the Waynesville area. As they approached Waynesville, Mosley realized that Myers had decided to rob Cates rather than the drug dealer.

{¶ 4} The two men arrived at the Cates house around noon. But when they got there, Back was at home, so they decided not to commit the robbery. Instead, they visited with Back for 15 to 20 minutes and then left. After leaving the house, Myers and Mosley went to the Waynesville library to discuss how to "get the money." According to Mosley, it was during this discussion that Myers "came up with the idea of killing Justin Back."

{¶ 5} Their first plan was to give Back a fatal injection. Mosley suggested using cold medicine, so they went to a Waynesville store to buy some. Mosley picked up four boxes of nighttime cold medicine, and Myers added a bottle of poisonous "bug wash." Myers carried these items to the checkout counter but could not complete the purchase because his credit card was declined. Then Myers tried to withdraw money from the store's ATM, but that did not work either.

{¶ 6} Empty-handed, the two left the store, and Myers directed Mosley to a nearby pharmacy, where Myers asked a clerk for syringes. When Myers explained that he wanted the kind with needles, the clerk referred him to the pharmacist. They stood in line briefly at the pharmacy counter but walked out without syringes.

{¶ 7} Myers and Mosley returned to the Cates house later in the day and watched a movie with Back. When Cates came home from work, he joined them

in watching the movie for a short time until he and Back had to leave for an appointment with a Navy recruiter. At that point, Mosley and Myers left the house and drove to a McDonald's in Waynesville.

{¶ 8} In the McDonald's parking lot, the pair plotted "what to do * * * to further the plans." As Mosley tells it, he proposed returning immediately to the Cates house and breaking in while Cates and Back were away. But Myers rejected that idea, reasoning that they did not know how long Cates and Back would be gone. Instead, they went to their friend Logan Zennie's house, driving past the Cates house "to scout it out." Later, Myers, Mosley, Zennie, and a fourth man, named Cole, went to Mosley's house.

{¶ 9} At Mosley's house, while Zennie and Cole watched television downstairs, Mosley and Myers went to Mosley's room to "[come] up with another plan on how to get the safe." As they talked, Mosley wrote down their ideas in a small notebook.

{¶ 10} They hatched a scheme to strangle Back with a wire and then take the safe. The idea was to make it look as though Back had stolen the safe and run away from home. They planned to "take whatever [they] thought Justin would take"—specifically his "clothes, money, phone and charger"—and dump his body in a remote wooded area.

{¶ 11} According to Mosley, Myers then suggested that they kill Cates as well. Myers proposed that they "mak[e] it look like [Cates] killed [Back] and * * * ran off." Mosley testified that he opposed this idea because it would involve more work and greater risk.

{¶ 12} Their planning session complete, Mosley and Myers headed to a Lowe's store in Trotwood. Myers bought a three-foot length of galvanized steel cable and two metal rope cleats. Their intent was to fashion a garrote—or "choke wire" as Mosley called it—from these items by securing a cleat to each end of the cable.

{¶ 13} They returned to Mosley's room to put together their garrote, where Zennie walked in on them before they could hide the materials. At trial, Mosley could not recall precisely what they had told Zennie but said that they did not tell him what they planned to do with the garrote. In any event, Zennie put the garrote together for them.

{¶ 14} The next morning, Myers and Mosley bought more supplies. Mosley suggested buying ammonia, because he believed from watching crime shows that "it would destroy any DNA." Myers had the idea of purchasing "septic enzymes." He explained to Mosley that the cold weather would slow the body's decomposition; he thought they could speed up the process by pouring the enzymes on it. They drove to a store northwest of Dayton, where Myers bought ammonia, septic-tank cleaner, and rubber gloves.

{¶ 15} The pair returned to Waynesville. Myers intended to commit the crime around 1:00 p.m. Needing to burn some time, they browsed an antiques store for a while. At 12:48 p.m., they bought gas for the car. After driving past the Cates house several times, they pulled in the driveway around 1:00. The plan, according to Mosley, was for Myers to distract Back while Mosley came up behind him. Myers would hold Back down while Mosley choked him to death with the garrote. Mosley stuffed the garrote into one of his pockets. He also was carrying a five- or six-inch pocketknife.

**B. The Murder**

{¶ 16} Myers knocked on the door. Back answered and let the pair in. The three men talked for a while. At some point, Back asked Myers if he wanted a drink. Myers said he did, so Back went with him to the kitchen. Mosley "saw the opportunity" and followed them.

{¶ 17} Back opened the refrigerator and bent down to get the drink. As Back was straightening up, Mosley looped the garrote cable over Back's head from behind and crossed his arms to pull it tight. At the same time, Myers grabbed Back

to restrain him. Mosley kicked Back's feet from under him, and all three fell to the floor, entangled.

{¶ 18} Mosley, however, had not been able to get the cable around Back's neck; instead, it was looped around his chin. As Back struggled for his life—which took "a good couple of minutes"—he repeatedly asked "[W]hy[?]" and pleaded with his assailants to stop. Myers tried to "calm him down" by saying something "[along] the lines of it's all right, it's almost over * * *."

{¶ 19} After Myers told Mosley that Mosley "had missed his throat and that [the wire] was wrapped around his chin," Mosley panicked, pulled out his knife, and stabbed Justin in the back. After that, Myers took hold of the garrote and managed to get it around Back's neck. Sitting on the on the kitchen floor with his back to the wall, Myers pulled on the garrote with Back lying in his lap. Mosley then began stabbing Back in the chest. When he was done, there was "blood everywhere."

{¶ 20} After Back died, Mosley and Myers hunted for the safe, which they found in a closet in the master bedroom. But contrary to their expectations, it was locked. (Cates testified that although he had previously left the safe unlocked because he had lost the combination, someone had inadvertently locked it, and he had not opened it for some time.) Myers also found a handgun belonging to Cates, which he loaded.

{¶ 21} The pair returned to the kitchen where they cleaned up the crime scene using ammonia, small rugs from the kitchen floor, and assorted rags and towels. They wrapped Back's body in a blanket and shoved it in the trunk of Mosley's car. Then they ransacked the house, taking the safe as well as some jewelry and credit cards. Myers filled some bags with Back's clothing. They also filled a laundry basket with more clothes and other items, including Back's headphones, glasses, laptop computer, phone charger, and laptop charger. They

stuffed the bloody towels, rags, and rugs into a garbage bag. They loaded everything into Mosley's car and left the house by about 2:00 p.m.

{¶ 22} Andrew Raymond, a next-door neighbor of the Cates family, saw Mosley's car in the Cateses' carport early that afternoon. A silver Chevrolet Cavalier, the car had a distinctive appearance, its entire rear window having been replaced by a sheet of plastic held in place with red duct tape. A side window of the car sported a "Tap Out" sticker. Raymond had seen someone coming out of the back door of the Cateses' house. He did not recognize the person but knew it was not Back.

{¶ 23} While driving, Mosley developed "paranoia" about being followed, so he took side roads to a remote area, where he parked and checked the outside of the car for blood. Then he and Myers searched for Back's wallet, which they located in one of the bags. The wallet contained more than $100, which Myers took. The two continued on to Mosley's house.

### C. Disposing of the Evidence

{¶ 24} Myers went into Mosley's house and rinsed the blood from his hands and arms. Meanwhile, Mosley unloaded stuff from the car to his bedroom. Together, they dragged the safe up the stairs and then changed their clothes. Mosley proposed dumping the body near West Alexandria, an area he knew well. That was fine with Myers, so they headed that way.

{¶ 25} They decided to hide the body behind a log in a field near "Cry Baby Bridge" near the village of Gratis in Preble County. Mosley drove into the field, stopping about 20 feet from the log. The pair carried the body to the log and laid it on the ground. They found Back's iPod on his body and took it. Myers then poured ammonia and septic enzymes onto the corpse, which was still clothed and partly wrapped in the blanket.

{¶ 26} According to Mosley, Myers "wanted to shoot the body," so Mosley got the stolen gun from the car and handed it to Myers, who fired two shots into

6

Back's body. The gun jammed on the third shot. Myers cleared the jam, ejecting the bullet to the ground, where it was later found by the police.

{¶ 27} After they hid the body, Myers suggested again that they kill Cates to make it look as if he had killed Back and disappeared. Mosley vetoed this idea. Instead, the men drove to a park in Brookville, where Mosley tossed Back's laptop into a dumpster. They then pulled into a nearby tavern parking lot to get rid of the iPod. Myers hid it in the gap between the windshield and the hood of a parked car.

{¶ 28} They bought a crowbar in Englewood and went back to Mosley's house to crack open the safe. Instead of the $20,000 that Myers had promised, the safe contained "[p]aperwork, loose change, bullets, gun accessories, and random items." Myers and Mosley separated out items that they thought they could sell. Afterward, they burned the papers, several trash bags containing evidence of the crime, and their bloody clothes in a fire pit in the back yard.

{¶ 29} Myers and Mosley put everything from the house and safe that looked valuable (including the gun, headphones, sunglasses, a coin collection, and a necklace) into a bag and took it to Zennie's house. Zennie let them store the bag in his safe in his bedroom. Myers, Mosley, and Zennie next drove to Tipp City, where they threw Cates's safe into a river.

### D. The Investigation

{¶ 30} Cates came home from work around 3:30 p.m. that day. He realized that a table had been moved and that some rugs were missing. Later, he and his wife found that Cates's safe and handgun were missing. They called 9-1-1 and tried to contact Back. They discovered his cell phone in the house and also found the shoes that he always wore when he went out.

{¶ 31} During the ensuing investigation, officers obtained a description of the car Raymond had seen in the Cateses' carport and were informed by Cates that Myers had visited the Cates house the day before in the same car. Warren County sheriff's detectives sent out a "be on the lookout" alert for Myers and the car to

nearby police departments and county sheriffs. The car was located by the Clayton police, who detained Myers at Mosley's house and notified the Warren County detectives.

{¶ 32} The detectives interviewed Myers at the Clayton police station early the next morning, January 29. He denied knowing anything about Back's disappearance or the burglary at the Cates residence. After the interview, Myers was taken back to Mosley's house, and Mosley was taken to the station for questioning. When the detectives finished talking with Mosley, he was returned to his house, and Zennie was taken to the station. Based on what they learned from Zennie, the detectives had Clayton police officers arrest Mosley and Myers and return them to the station. The detectives again interviewed Mosley and then Myers. The story of the murder started coming out.

{¶ 33} Myers admitted that he had been present when Mosley stabbed Back. He said that when he had gone to hang out with Back on January 28, he did not know that Mosley was going to kill Back. Nor did he know why Mosley had killed Back. Myers denied shooting Back's body, claiming instead that Mosley had done that.

{¶ 34} When the detectives interviewed Mosley again, he confessed, telling essentially the same story he later told at trial. Following Mosley's confession, the detectives interviewed Myers, who again changed his story. This time, he admitted shooting the body. He also acknowledged buying the materials to make the garrote, which he described as a "self-defense weapon" that was to be used only "to knock [Back] out," not to kill him. He continued to deny that he had restrained Back during the murder.

{¶ 35} That day, Preble County sheriff's deputies found Back's body near Cry Baby Bridge. The body was covered in white powder—later determined to be septic enzymes. A Montgomery County coroner autopsy determined that Back had died of multiple stab wounds.

8

## E. Indictment, Trial, and Sentence

{¶ 36} Myers was indicted on nine counts:

| Count 1 | aggravated murder with prior calculation and design (R.C. 2903.01(A)) with three death-penalty specifications: kidnapping, aggravated burglary, and aggravated robbery (R.C. 2929.04(A)(7)) |
|---------|---|
| Count 2 | aggravated murder—felony-murder (R.C. 2903.01(B)) with three death-penalty specifications: kidnapping, aggravated burglary, and aggravated robbery (R.C. 2929.04(A)(7)) |
| Count 3 | kidnapping (R.C. 2905.01(A)(2)) |
| Count 4 | aggravated robbery (R.C. 2911.01(A)(3) with a firearm specification |
| Count 5 | aggravated burglary (R.C. 2911.11(A)(1)) with a firearm specification |
| Count 6 | grand theft of a firearm (R.C. 2913.02(A)(1)) with a firearm specification |
| Count 7 | tampering with evidence (R.C. 2921.12(A)(1)) |
| Count 8 | safecracking (R.C. 2911.31(A)) |
| Count 9 | abuse of a corpse (R.C. 2927.01(B)) with a firearm specification |

{¶ 37} The jury found Myers guilty on all counts and specifications. The two aggravated-murder counts were merged for purposes of sentencing, and the state elected to proceed on Count 1—aggravated murder with prior calculation and design—with the aggravated-robbery specification for the penalty phase. The jury recommended a death sentence, and the trial judge sentenced Myers to death. The judge imposed prison sentences on the noncapital counts.

{¶ 38} Myers now appeals to this court, presenting 18 propositions of law. We have examined each of Myers's claims and find that none has merit. Accordingly, we affirm Myers's convictions and sentence of death.

## II. SHACKLING ISSUES

**{¶ 39}** We begin with Myers's ninth proposition of law, in which he contends that the trial court violated his due-process rights and denied him a fair trial by requiring that he wear leg shackles during the trial.

**{¶ 40}** Before trial, Myers filed a motion to be tried without restraints. The trial court held a hearing on the motion. Major Barry Riley, the jail administrator, testified that the sheriff's office initially classified Myers as a "maximum security" inmate because he was charged with a "brutal, premeditated murder." Myers's security classification was later increased due to "jailhouse infractions," including destroying jail property and fashioning a rope from a cloth. (Myers claimed that he intended to use the rope as a belt, but Riley testified that such a rope could also be used as a weapon or to tie a door shut.) Based on Myers's classification and the security concerns involved, Riley recommended that Myers be kept in "maximum restraints," including "leg shackles, belly chains and handcuffs." The "least restrictive restraint" that Riley felt he could recommend was leg shackles.

**{¶ 41}** On cross-examination, Riley conceded that there had not been a specific incident involving Myers in the courtroom or during transport. He also agreed that the shackles would probably make noise when Myers moved his legs.

**{¶ 42}** After Riley testified, a defense attorney stated that the defense did not "strenuously object" to leg shackles if the shackles could be concealed. The attorney explained that the defense was principally concerned about the use of handcuffs and belly chains.

**{¶ 43}** After the hearing, the trial court issued an order establishing security protocols. The court found: "Based on the evidence and arguments of counsel, * * * the nature of the proceedings and the specific security risks posed by this Defendant require a heightened level of security." Thus, the court ordered that Myers be transported to and from the courtroom in restraints to be determined by the sheriff's department. But the courtroom was to be cleared of the public before

Myers entered, all restraints other than leg restraints were to be removed before the public was readmitted, and the courtroom was to be cleared at the close of the hearings prior to Myers's departure. The court further directed that a "modesty panel" be placed under both counsel tables to "obscure the leg restraints from the view of the jury." Finally, the court found that the protocols established by its order were the "least restrictive means of security and restraint available."

{¶ 44} "No one should be tried while shackled, absent unusual circumstances." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 82. "The decision to impose such a restraint is left to the sound discretion of the trial court, which is in a position to consider the prisoner's actions both inside and outside the courtroom, as well as his demeanor while court is in session." (Citation omitted.) *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79. "The trial court must exercise its own discretion and not leave the issue up to security personnel." *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 104. Myers contends that leg shackles were not necessary to protect courtroom security and that the trial court improperly deferred to the sheriff's office in making its decision. But here, the court merely heard the concerns presented by Riley. Notably, the court did not accede to Riley's request to have Myers in handcuffs and belly chains. And the court ordered a modesty panel so that the leg shackles would not be visible. We conclude that there was no abuse of discretion.

{¶ 45} Nor has Myers shown that his due-process rights were violated. Due process "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). "[A] claim based on *Deck* 'rises or falls on the question of whether the [restraining device] was visible to the jury.' " *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir.2017), quoting

*Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir.2009). The procedures put in place for Myers to enter and leave the courtroom out of the view of the public, along with the modesty panel ordered by the trial court, shielded the shackles from view. There is nothing in the record to indicate that the jury saw the shackles.

{¶ 46} Indeed, Myers does not claim that his shackles were visible. Rather, he argues that the jury was aware of the shackles because they made noise. Significantly, at no time during the trial did anyone mention noise coming from the shackles. Having raised the subject during the hearing, trial counsel were well aware of the possibility that the shackles might make noise. We would expect, then, that trial counsel would have called any such noise to the court's attention. On the state of this record, Myers's claim that the jury was aware of the shackles is mere speculation.

{¶ 47} Myers further argues that he was prejudiced because the shackles prevented him from rising when prospective jurors entered the courtroom during voir dire. Before voir dire began, the court ordered that everyone already in the courtroom would remain seated when the prospective jurors were brought in so that Myers's shackles would not be seen. Nonetheless, Myers claims error based upon the following discussion that occurred outside the presence of the venire on the third day of voir dire:

> [Defense counsel]: * * * Sorry, Judge, we're used to standing up when the Court comes in, especially when somebody says all rise. We stand up, they stand up, I know the court has indicated it's not necessary, there's a concern because Mr. Myers is shackled * * *, do you want us to just stay down? Because what I don't want to have happen is we all stand up and he doesn't stand up and then some juror goes he's being disrespectful.

THE COURT: What has been happening, is I've been coming in before the jury has been here and I know that you guys stand up and when we just entered the courtroom before, I mean the jury wasn't here yet. The all rise was not supposed to happen. My plan is to be seated here and have everybody else seated here and when the jury comes in, everybody remains seated. If you stand up when the jury comes in, I will tell you to sit down.

[Defense counsel]: Fair enough, I just wanted some clarification on that Judge, thank you.

(Capitalization sic.)

{¶ 48} From this, Myers asks us to infer that "during the majority of *voir dire*, every time the [venire] came in and the bailiff said 'All rise,' all the attorneys stood up, but Myers could not due to the shackles." But, actually, the above passage provides no indication that this had happened more than the one time alluded to by the trial court. In any event, Myers claims prejudice, arguing that his failure to stand up for the venire's entrance when the attorneys were doing so made "a bad impression" on the prospective jurors. But nothing in the record suggests that the problem—assuming there was one—recurred after the trial judge clarified that counsel were not to rise for the venire's entrance. During trial, the jurors would have observed that nobody rose when they entered the courtroom, and any impression they may have formed as a result of Myers's failure to do so during voir dire likely had faded. Consequently, we see no likelihood that any error that may have occurred during voir dire affected the verdict or sentence.

{¶ 49} Myers's ninth proposition of law is overruled.

### III. SUPPRESSION ISSUES

{¶ 50} In his third proposition of law, Myers contends that the trial court should have suppressed the statements he made to Detectives Michael Wyatt and

Paul Barger on January 29. His principal claim is that he was subjected to custodial interrogation without being advised of his *Miranda* rights. *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also maintains that he never validly waived his right to remain silent, that he was denied his constitutional right to counsel, and that his statements were involuntary.

### A. Lack of *Miranda* Warnings for the First Interview

{¶ 51} After midnight on January 29, Sergeant Jeff Garrison of the Clayton police department and another Clayton police officer went to Mosley's house to locate Myers. Garrison cuffed Myers's hands behind his back, walked him outside, searched him for weapons, and placed him in the back seat of a cruiser. Garrison told Myers that "he was being detained for Warren County."

{¶ 52} Warren County Detective Wyatt arrived at Mosley's house around 2:50 a.m. He opened the cruiser door and found Myers asleep. Wyatt woke Myers, identified himself, explained that the police were looking for Back, and asked Myers if he was willing to come to the nearby Clayton police station to talk. Myers agreed.

{¶ 53} Myers emphasizes that the Clayton police detained him in handcuffs at Mosley's residence. Indeed, the trial court determined that Myers was in the custody of those officers during that time. But Myers was not interrogated and made no statements during that period. "[I]n conducting the Miranda analysis, we focus on the time that the relevant statements were made." *United States v. Swan*, 842 F.3d 28, 31 (1st Cir.2016). Thus, our analysis is not controlled by the fact that Myers was in custody before the first interview. Instead, we turn our attention to whether Myers was in custody during the first interview.

{¶ 54} A Clayton officer drove Myers to the Clayton police station, with Wyatt and Barger following. At the station, Myers was removed from the cruiser. When Wyatt noticed that Myers was handcuffed, he asked the Clayton officer to take off the cuffs, and they were removed before Myers entered the building. Wyatt

and Barger took Myers into a conference room, where the three of them sat at a table with Wyatt farthest from the door. Myers sat on Wyatt's right, closer to the door; Barger sat across the table from Myers. The door was initially closed but at some point during the interview it was opened and was left open for the rest of the interview.

{¶ 55} This first interview, which was audio recorded, began at 3:07 a.m. Wyatt did not give Myers *Miranda* warnings at this time. Rather, at the start of the interview, Wyatt said: "Like I told you * * * we appreciate you * * * coming down here and * * * like I told you, *you're free to go at any time. You're not under arrest* or anything else." (Emphasis added.) When Myers said that he had been confused, because the Clayton officers had told him he was being "detained," Wyatt repeated: "You understand, though, *you're not under arrest * * *.*" (Emphasis added.)

{¶ 56} During the interview, Myers claimed to know nothing about Back's disappearance or the robbery of the Cates residence. The interview ended at 3:54 a.m., and Myers was driven back to Mosley's house.

> The fundamental import of the privilege [against self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but *whether he can be interrogated*. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

(Emphasis added.) *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694. Thus, *Miranda* warnings are required "only when a suspect is subjected to both custody and interrogation." *Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 119.

**{¶ 57}** "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 9, citing *Miranda* at 469. Determining whether questioning is "a custodial interrogation requiring *Miranda* warnings demands a fact-specific inquiry that asks whether a reasonable person in the suspect's position would have understood himself or herself to be in custody while being questioned." *Oles* at ¶ 21.

**{¶ 58}** The trial court found that Myers was not in custody during the first interview, and we agree. When Wyatt noticed that Myers was handcuffed, he immediately had the cuffs removed, remarking that Myers was "here voluntarily." Myers was questioned in a conference room instead of an interrogation room, *see United States v. Littledale*, 652 F.3d 698, 702 (7th Cir.2011), and was seated at a conference table with Wyatt and Barger. The door was open during part of the interview, and it does not appear that either detective was situated between Myers and the door. *See United States v. Mshihiri*, 816 F.3d 997, 1004 (8th Cir.2016); *United States v. Berres*, 777 F.3d 1083, 1092 (10th Cir.2015).

**{¶ 59}** Moreover, Myers was expressly informed at the beginning of the interview that he was not under arrest and was free to leave at any time. *See Swan*, 842 F.3d at 31-33; *United States v. Muhlenbruch*, 634 F.3d 987, 996-997 (8th Cir.2011); *Commonwealth v. Sanchez*, 476 Mass. 725, 736, 73 N.E.3d 246 (2017).

**{¶ 60}** A reasonable person, having just been released from handcuffs and expressly told that he was there voluntarily and was free to leave, would not have understood himself to be in custody. *Miranda* warnings were not required.

### B. Validity of *Miranda* Waiver

**{¶ 61}** Myers had four more contacts with Wyatt and Barger on January 29.

**{¶ 62}** After the first interview with Myers, Wyatt and Barger interviewed Mosley and then Zennie. During Zennie's interview, Wyatt learned that Mosley had told Zennie that Myers had shot Back and Mosley had stabbed him. Wyatt

instructed the Clayton officers at Mosley's house to detain both men. Myers was taken back to the Clayton police station around 7:40 a.m., placed in a holding cell, and handcuffed to a bench.

**{¶ 63}** At 7:42 a.m., Wyatt administered *Miranda* warnings to Myers. He asked Myers if he understood the warnings, and Myers nodded his head. Myers almost immediately invoked his right to counsel; Wyatt ended the interview at 7:45 a.m., and he and Barger left the room.

**{¶ 64}** At 9:27 a.m., Myers tapped on the window in the holding cell, summoning Wyatt. Myers expressed a desire to help Wyatt, but Wyatt told him he could not talk to him or question him. Myers then asked Wyatt how he would go about getting an attorney. Wyatt told him that he could hire his own but that if he could not afford to do so, the court would appoint counsel when he was charged. Myers asked if he was going to be charged, and Wyatt said that he would be.

**{¶ 65}** Myers tapped on the window again at 10:02 a.m. When Wyatt responded, Myers told him he wanted to do what he could to help him. Wyatt asked whether that meant Myers wanted to talk to him. Myers nodded his head. Wyatt read Myers the *Miranda* warnings again and asked him if he understood them. Myers said: "I think so." Wyatt asked: "Do you think so or do you understand?" Wyatt continued: "Basically what it amounts to is you can exercise those rights at any time. If you want to start talking and then stop you can do that. * * * Do you have any questions about it because I want to make sure you fully understand your rights?" Myers said: "Yeah. I do." Wyatt asked: "You do?" Myers said: "Yeah." Wyatt clarified this discussion at the hearing on Myers's motion to suppress: "The question was do you understand your rights and he said yes, I do." Myers then proceeded to answer Wyatt's questions, giving an account of how Mosley had killed Back.

**{¶ 66}** At about 1:30 p.m., Wyatt and Barger spoke with Myers for a fifth time. Wyatt read the *Miranda* warnings for the third time; Myers indicated that he understood them and answered Wyatt's questions.

**{¶ 67}** The 10:02 a.m. and 1:30 p.m. interviews of Myers were preceded by *Miranda* warnings. Myers nevertheless claims that the statements he made in those interviews should have been suppressed. He argues that he never validly waived his rights because (1) he was not given the *Miranda* warnings in written form (Wyatt read them from a card he carried), (2) Wyatt did not expressly ask him whether he wished to waive his rights, and (3) he never signed a written waiver.

**{¶ 68}** None of these objections are well taken. A *Miranda* waiver need not be in writing to be valid. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Nor must the accused specifically state that he waives his rights. *Id*. at 375-376; *Treesh v. Bagley*, 612 F.3d 424, 434 (6th Cir.2010). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010); *see also State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 100-101.

**{¶ 69}** The state made that showing here. At the outset of the 7:42 a.m. interview, Wyatt read the *Miranda* warnings to Myers, and Myers acknowledged that he understood his rights. Myers's invocation of his right to counsel further demonstrates his understanding.

**{¶ 70}** The 10:02 a.m. interview took place after Myers summoned Wyatt and said he wanted to talk to him. Wyatt then read the *Miranda* warnings again. After stating that he fully understood the warnings, Myers proceeded to answer Wyatt's questions. Because Myers was informed of his *Miranda* rights and indicated that he understood them, his uncoerced statements to Wyatt validly established an implied waiver. *Butler* at 373.

{¶ 71} At the beginning of the 1:30 p.m. interview, Wyatt read the *Miranda* warnings again, and Myers again said that he understood his rights and voluntarily spoke to Wyatt. Again, his uncoerced statements under these circumstances were enough to establish a waiver.

## C. Denial of Counsel

{¶ 72} Myers also contends that his later statements should have been suppressed because after he invoked his right to counsel, he was interrogated without counsel being appointed.

{¶ 73} Myers notes that he was never "given" an attorney on that day. "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Duckworth v. Eagan*, 492 U.S. 195, 204, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). Once Myers invoked his right to counsel, his waiver of that right could not "be established by showing only that he responded to further police-initiated custodial interrogation" after he was advised of his rights. *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Rather, having expressed his desire to have counsel present, Myers could not be subjected to further interrogation until counsel was made available "unless [he] himself initiate[d] further communication, exchanges, or conversations with the police." *Id.* at 485.

{¶ 74} That is precisely what happened here. Wyatt terminated the 7:42 a.m. interview when Myers invoked his right to counsel shortly after the interview began. Less than two hours later, Myers summoned Wyatt and asked how he would go about getting an attorney. Wyatt told him he could hire one or one would be appointed for him after charges were filed. No questioning took place at this point.

{¶ 75} Half an hour later, Myers tapped on the glass again and told Wyatt he wanted to "help" the officers. Wyatt again administered *Miranda* warnings, and Myers gave an account of how Mosley had killed Back. Thus, Myers, after

invoking his right to counsel, "initiate[d] further communication, exchanges, or conversations with the police," *Edwards* at 485. There was no violation of Myers's right to counsel.

## D. Voluntariness

{¶ 76} Finally, Myers contends that his statements were involuntary under the totality of the circumstances.

{¶ 77} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances * * *." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *death penalty vacated on other grounds sub nom. Edwards v. Ohio*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). Relevant circumstances include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Id.* However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 78} Myers claims he was deprived of food and sleep during the interrogation. But the record does not support Myers's claim. Myers never indicated that he was hungry or asked for anything to eat until after the end of the final interview on January 29.

{¶ 79} Nor is there any evidence that Myers was deprived of sleep. Toward the end of his first interview, Myers stated that he was "very tired" and wanted to go back to Mosley's house to sleep. Within a few minutes, Wyatt terminated the interview and a Clayton police officer took Myers back to Mosley's house. When Mosley did not want Myers inside the house, Myers was allowed to sit in the back of Sergeant Garrison's SUV to keep warm. He fell asleep there. Wyatt testified that when he returned to Mosley's house to have Clayton police bring Mosley back

to the police station, Myers appeared to be sleeping. Although the record indicates that Myers was not asleep during the entire time he was in the SUV, there is no suggestion that anyone prevented him from sleeping at any time.

{¶ 80} Myers had additional time to sleep in the holding cell at the Clayton police station between 7:46 a.m. and 1:30 p.m. During that time, the police left him alone, except when he initiated contact with them. The holding-cell video shows that he was lying down on a bench in the cell for about 70 minutes between the fourth and fifth interviews.

{¶ 81} Finally, there is no indication of any other form of police overreaching. Myers was given water and escorted to the bathroom when he requested it. He was not harmed, threatened, or promised anything. We conclude that Myers's statements were voluntary.

{¶ 82} Because the record supports none of Myers's claims and arguments in favor of suppression, we overrule his third proposition of law.

## IV. DISCOVERY AND RELATED ISSUES
### A. Delayed Disclosure and *Brady* Claim

{¶ 83} In his fourth proposition of law, Myers contends that the state violated his right to a fair trial by failing to provide timely discovery and by delaying disclosure of evidence favorable to him. Crim.R. 16; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 84} On September 22, 2014, the first day of voir dire, defense counsel complained to the trial court that the state had provided large amounts of "additional discovery" since September 2. Among other things, counsel objected to the timeliness of the prosecution's disclosure that Mosley would be testifying for the state and that it planned to introduce a small notebook kept by Mosley. The notebook listed supplies the pair would need for the murder ("crowbar," "wire" and "duct tape") along with notes about their plan ("strangle," "no mess," "take clothes, money, phone, charger," "disappear," "state: figure out as we go," "woods: no

public," "wrap up in blanket"). Myers asserts that the late disclosure of Mosley's planned testimony and the notebook amounted to "trial by ambush" and that he was deprived of a meaningful possibility of investigating and challenging the veracity of the notebook's contents.

{¶ 85} The prosecutor maintained that all discovery was turned over as soon as it became available to the state. Regarding Mosley's plea agreement, which required that he testify against Myers, the prosecutor said that Myers's defense counsel had been told of the plea agreement as soon as it was agreed upon. One of Myers's defense attorneys candidly admitted to the trial court, "I told [the prosecutor on September 2] I didn't think I needed a continuance. I had * * * Mr. Mosley's recorded statement from the Clayton Police Department, which was given to us in the initial discovery dump." The defense attorney explained that at the time he said that to the prosecutor, he believed that he had "ample time to prepare for Mr. Mosley's testimony."

{¶ 86} As for the notebook, the prosecutor explained that it was only after Mosley agreed to plead guilty and the prosecutor starting preparing Mosley for trial that he learned of the notebook. The state then asked Mosley's attorney to contact Mosley's family who located the notebook in Mosley's bedroom and turned it over on the evening of September 20. The prosecutor unsuccessfully tried to e-mail photographs of the notebook to defense counsel on Sunday, September 21.

{¶ 87} Under Crim.R. 16(L), the court has discretion to regulate discovery. Here, the court preliminarily determined that any items turned over after September 16 would not be admitted during trial "unless we have a hearing outside the presence of the jury with regard to that specific evidence as to why it should be admitted due to the lateness of both the collection and the obtaining of the information." Defense counsel did not object to the court's approach, and Myers has not directed us to any instance when he objected to evidence offered during trial—other than the notebook—on the basis of its having been turned over late in

discovery. As for the notebook (and as we will also discuss regarding the next proposition of law), the trial court did hold a hearing regarding its admissibility prior to Mosley's testimony. The trial court concluded that its admission was not barred by any discovery violations and that it "was turned over to the defense as soon as practical under the circumstances." We conclude there was no abuse of discretion here.

**{¶ 88}** Myers also maintains that the state improperly failed to timely disclose exculpatory evidence. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. As Myers sees it, the inclusion of Mosley on the state's witness list was evidence favorable to Myers "because Mosley had no credibility as a witness due to his receiving a plea bargain with the State on the eve of trial which took the possibility of the death penalty off the table and instead provided for life imprisonment without the possibility of parole in exchange for testifying against Austin Myers." But Mosley's testimony—which detailed the plan, the murder, and the cleanup—was far from exculpatory for Myers. And even if it were, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994), citing *United States v. Word*, 806 F.2d 658, 665 (6th Cir.1986).

**{¶ 89}** Myers has demonstrated no abuse of discretion with respect to any discovery matters in the case or any alleged *Brady* violations. We overrule his fourth proposition of law.

### B. Denial of a Continuance

**{¶ 90}** In his fifth proposition of law, Myers contends that in light of the state's allegedly late disclosure of evidence, the trial court should have granted his request for a continuance.

**{¶ 91}** As an initial matter, Myers suggests in his brief that the trial court improperly held an off-the-record discussion of his motion for a continuance. But it is clear from the transcript that the discussion of Myers's continuance request was

on the record and that the off-the-record discussion Myers complains about actually related to Myers's motion for a handwriting expert. Furthermore, counsel did not object to the court's handling of the situation.

{¶ 92} "It is a basic due process right and indeed essential to a fair trial that a defense counsel be afforded the reasonable opportunity to prepare his case." *State v. Sowders*, 4 Ohio St.3d 143, 144, 447 N.E.2d 118 (1983). But "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). "Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* at 11-12, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed2d 921 (1964). Moreover, the defendant must show how the denial of a continuance prejudiced him. *State v. Broom*, 40 Ohio St.3d 277, 288, 533 N.E.2d 682 (1988).

{¶ 93} We conclude that the court did not abuse its discretion here. As discussed above, the court told the parties that any items turned over late in discovery—including the notebook—would be inadmissible unless a further hearing was held. A hearing regarding the notebook was held the afternoon before Mosley testified—more than three days after the notebook had been disclosed. At the hearing, defense counsel challenged the admissibility of the notebook but did not renew the request for a continuance. There is no indication that the timing of the disclosure compromised Myers's ability to defend himself. Myers is unable to show prejudice, and the trial court did not abuse its discretion by denying the request for a continuance. We overrule Myers's fifth proposition of law.

24

### C. Denial of Handwriting Expert

{¶ 94} After the trial court denied Myers's motion for a continuance, the defense moved for the appointment of a handwriting expert to determine whether Mosley had in fact written the notes in the notebook. In his seventh proposition of law, Myers contends that the trial court erred by denying the motion.

{¶ 95} "[D]ue process may require that a defendant be provided * * * expert assistance when necessary to present an adequate defense." *State v. Mason*, 82 Ohio St.3d 144, 149, 694 N.E.2d 932 (1998). A defendant requesting an expert must make a particularized showing that the requested assistance would aid in the defense and that denial of the assistance would result in an unfair trial. *Id*. at 150. Here, because defense counsel requested that his discussion with the judge of the motion for a handwriting expert be ex parte to prevent the prosecution from learning the defense's strategy and it was held off the record, there is little indication of the basis for the motion. On the record, defense counsel said, ""I don't know whose handwriting it is, nothing and I'm not going to rely on Tim Mosley to say it's his." Counsel's statements amount to little more than raising a possibility that an expert might have helped Myers's case. We conclude the trial court did not abuse its discretion when it refused to provide the handwriting expert. *See State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph four of the syllabus. The seventh proposition of law is overruled.

### V. VOIR DIRE

{¶ 96} In his 14th proposition of law, Myers raises two claims with respect to the voir dire.

### A. *Caldwell* Error

{¶ 97} Myers complains that during the death-qualification process (which was conducted in panels), the prosecutor asked a prospective juror whether he "could return a recommendation for death." The defense objected, and the trial court instructed:

Ladies and gentlemen, [the prosecutor] has twice now used the term recommendation. It's not a recommendation, it's a verdict. Any verdict that is rendered by you should be considered by you as if it is absolute and will be carried out in this case. * * * [S]o don't take what the attorneys say in this case as being the facts or the law. You'll get that later in the proceedings.

Myers contends that the prosecutor's use of "recommendation" impermissibly diminished the jury's sense of responsibility, *see generally Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and that the trial court's instruction did not cure the problem.

{¶ 98} But Myers can demonstrate no prejudice as a result of his claimed error. None of the prospective jurors on the panel at the time of the alleged error ultimately served on the jury.

### B. Excusal for Cause

{¶ 99} Myers also contends that the trial court erred by excusing prospective juror No. 163 for cause.

{¶ 100} Prospective juror No. 163 initially told the trial court that she was not religiously, morally, or otherwise opposed to capital punishment. But the transcript indicates that she was "crying" when the prosecutor asked: "Some people don't want to be put in that position, where they feel like they have the life of another person in their hands. * * * [D]o you feel that way?" She replied: "I am sorry. I just have two boys that are about this age."

{¶ 101} The prosecutor later asked several prospective jurors if they "could follow the Court's instructions and return a verdict of death" if they found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. When he put the question to prospective juror No. 163, she said: "I just

26

don't know."  The trial court followed up: "[W]e want jurors who can follow the law, based on what I give to you.  * * * [D]o you think you can do that?"  She replied:

> Well, I mean, I feel like I can follow the law, but I feel, I just—
> I mean, the way I feel this way like about a death penalty and I mean,
> I always felt like if someone did something wrong, they should pay
> the price for it, but I tell you when I walked in there yesterday and
> saw that kid sitting there, I just, *I don't know what to do*.  I just relate
> that to my own children and think, I mean, I can't explain it any
> different.

(Emphasis added.)  Later the prosecutor asked: "Do you feel like * * * he's too young and that under no circumstances you could return a verdict of death, even if you believed that the aggravating circumstances outweighed the mitigating factors?"  Prospective juror No. 163 said: "I think it [would] be extremely hard for me to decide because I know my heart says [yes] because of his age."

{¶ 102} The prosecutor then asked: "Do you feel like your ability * * * to fulfill your responsibilities as a juror would be substantially impaired by your convictions as to Mr. Myers['s] age?"  She answered: "[M]y head still says I want to say no to that *but my heart says yes*, I would have a really hard time getting past that."  (Emphasis added.)

{¶ 103} Defense counsel later asked her: "[I]f the Judge gives you certain options and asks you to follow the law, * * * [do] you think that you're able to do that?"  She replied: "I will do it to the best of my ability and I will follow the law. My heart might not want to do that, but I can—I mean, I think it would be troublesome, but you know, but—."

{¶ 104} Defense counsel then asked: "Would you agree that there are other things in your life that are very difficult perhaps that you may not want to do, but you follow your duty to do those?" Prospective juror No. 163 agreed that this was so, but she added: "But I never had to do something like that. * * * I'm in the business of saving lives, not—." (Prospective juror No. 163 was a registered nurse.) Finally, when asked, "[I]f you have that duty, [are you] able to do your duty as a citizen of our country?" she said, "Yes."

{¶ 105} The state challenged prospective juror No. 163 for cause. The defense opposed the challenge on the ground that "she had indicated by the end of the questioning that she was able to perform her duty with respect to acting as a juror."

{¶ 106} The trial court noted that prospective juror No. 163 "did break down crying at least on a couple of occasions during her testimony. * * * I think she cried throughout the process, [and] looked down, particularly when the questions were directed to her." Though the court recognized that she had said that she could perform her duty, the court observed that "she was crying even as she answered that question and I don't think that that answer represents the totality of her answers to the question." Concluding that "her emotional state would substantially impair her ability and that she cannot unequivocally state that she will follow the law," the trial court excused prospective juror No. 163 for cause.

{¶ 107} A prospective juror may be excused for cause if the prospective juror's views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). A trial court's ruling on a challenge for cause will not be overturned on appeal if the record supports it. *State v. Wilson*, 29 Ohio St.2d 203, 211, 280 N.E.2d 915 (1972).

{¶ 108} Myers argues that the record does not support the trial court's ruling here. Myers argues that prospective juror No. 163's answers "showed she was unbiased," while her tears indicated only that she understood the gravity of a death sentence. The trial court, however, was in the best position to consider her emotional reactions in ruling on the challenge for cause. *See State v. Lawrence*, 44 Ohio St.3d 24, 30, 541 N.E.2d 451 (1989) (prospective juror who cried during voir dire was properly removed for cause as "unsuitable to serve due to her emotional state"); *State v. Greer*, 39 Ohio St.3d 236, 248, 530 N.E.2d 382 (1988) (prospective juror who exhibited "considerable emotional difficulty" with death penalty on voir dire was properly removed for cause).

{¶ 109} When asked if her feelings would substantially impair her ability to perform her duty, prospective juror No. 163 said: "[M]y heart says yes." And while she did ultimately state that she would follow the law and do her duty, only once was she able to say so without qualification. At other times, she said: "I just don't know"; "I feel like I can follow the law, but * * * when I walked in there yesterday and saw that kid sitting there, * * * I don't know what to do"; "But I never had to do something like that"; and "I will do it to the best of my ability and I will follow the law. My heart might not want to do that, * * * I think it would be troublesome."

{¶ 110} "[W]here a prospective juror gives contradictory answers on voir dire, the trial judge need not accept the last answer elicited by counsel as the prospective juror's definitive word." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 66. Prospective juror No. 163's varying answers, along with her emotional state, created a fact question for the trial court to resolve. *State v. Jones*, 91 Ohio St.3d 335, 339, 744 N.E.2d 1163 (2001). The court's finding was supported by the record and therefore was not an abuse of discretion. *Wilson*, 29 Ohio St.3d at 211, 280 N.E.2d 915.

{¶ 111} Because Myers's claims with respect to the voir dire lack merit, we overrule his 14th proposition of law.

## VI. EVIDENTIARY ISSUES

### A. Admissibility of Mosley's Notebook

{¶ 112} Myers's eighth proposition of law challenges the admission of Mosley's notes into evidence. He argues that the notebook was "improperly examined," that it was inadmissible character evidence, and that its probative value was outweighed by the danger of unfair prejudice. We reject each of these claims.

*1. "Improperly Examined"*

{¶ 113} Before Mosley's direct examination, the trial court questioned him outside the jury's presence under oath to determine the notebook's admissibility. The judge said to Mosley, "Tell me the circumstances under which you wrote this." Mosley testified that he had written the notes while in his room with Myers "planning to kill Justin Back." He said the notebook was in the same condition as it had been when he wrote the notes and that he did not recall what had happened to pages that had been torn from the notebook.

{¶ 114} Myers complains that the trial court's inquiry was leading and that it "assumed Mosley wrote the document in the first place." Because he did not object to the trial court's questioning, Myers has forfeited all but plain error. Crim.R. 52(B). There was no error here; the rules of evidence did not apply to the court's inquiry into the admissibility of the notebook. *See* Evid.R. 104(A).

{¶ 115} Myers also complains that four pages were torn out of the notebook at some point and contends that the missing pages "had an altering effect on the writing." But nothing in the record demonstrates that the missing pages altered the writing on the portion that was admitted.

{¶ 116} Mosley's testimony was "sufficient to support a finding that the matter in question [was] what its proponent claim[ed]." Evid.R. 901(A); *see also* Evid.R. 901(B)(1) (testimony of witness with knowledge is valid authentication). While the missing pages may have affected the evidentiary weight of the notebook to be accorded by the jury, their absence did not render the notebook inadmissible.

## 2. *Character Evidence*

{¶ 117} Myers also argues that Mosley's notes were "improper character evidence," Evid.R. 404(A), and prejudiced him by depicting him as "unstable" and "generally dangerous." This is simply false. Neither the notes nor the testimony they corroborated were used to prove Myers's character "for the purpose of proving action in conformity therewith on a particular occasion." Evid.R. 404(A). Indeed, the notes were not used to prove his character at all; they were used to prove that Myers planned the murder, thus supporting the element of prior calculation and design.

## 3. *Probative Value vs. Unfair Prejudice*

{¶ 118} Finally, Myers argues that the notebook should have been excluded under Evid.R. 403(A), which requires exclusion of evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Myers claims that Mosley's notes "were not probative, because they did not go to [Myers's] identity as an accomplice." He also argues that because he did not write the notes, they were not probative of prior calculation and design.

{¶ 119} Contrary to Myers's assertions, Mosley's notes were highly relevant: they corroborated Mosley's account of the planning session he and Myers conducted before the murder. Mosley's testimony was the only direct evidence on this point, so the corroboration provided by his contemporaneous notes had strong probative value. And they created no danger of unfair prejudice, confusion, or misleading the jury.

{¶ 120} We overrule Myers's eighth proposition of law.

## B. Leading Questions on Direct Examination

{¶ 121} In his 13th proposition of law, Myers argues that the prosecutor improperly asked leading questions during the direct examination of several state witnesses. *See* Evid.R. 611(C).

**{¶ 122}** Although Myers cites transcript pages on which leading questions appear, he fails to identify any specific questions that he claims to be objectionable. Only one of the cited pages records a defense objection. Mosley testified that after leaving the Cates house the day before the murder, he and Myers briefly discussed their robbery plans, then drove past the Cates house "to scout it out," and finally "hopped on the highway" and drove back to Zennie's house. The prosecutor then asked: "The highway being [U.S. Route] 42, is that correct?" The defense objected. The objection was overruled, and Mosley said: "I think so."

**{¶ 123}** Although the question was leading, the trial court did not abuse its discretion by permitting it. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149. The question simply clarified Mosley's previous answer, identifying the "highway" he had mentioned.

**{¶ 124}** Defense counsel did not object to any other questions found on the transcript pages cited, so Myers has forfeited all but plain error. *See* Crim.R. 52(B). Because Myers does not identify specific questions as improper, we can neither evaluate his claims of error nor assess prejudice. Thus, Myers fails to demonstrate plain error. His 13th proposition of law is overruled.

### C. Autopsy Photographs

**{¶ 125}** Myers contends in his 15th proposition of law that the trial court erroneously admitted repetitive and gruesome photographs of Back's body. He concedes, however, that his counsel did not object at trial to admission of the photographs. Thus, he has forfeited all but plain error. *See* Crim.R. 52(B).

**{¶ 126}** We have held:

> Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or * * * illustrative of testimony and other evidence, as long as the danger of

material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.

*State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus. We review a trial court's decision to admit photographs for an abuse of discretion. *See State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69.

{¶ 127} Aside from a statement in his brief that the photographs were "repetitious and gruesome" and "inflamed the jury's emotions and distracted them from reviewing contested issues," Myers offers no analysis to show which photographs were repetitive, why their prejudicial effect outweighs their probative value, or how they constitute plain error.

{¶ 128} A transcript citation in Myers's brief indicates that he is challenging the autopsy photographs used during the deputy coroner's testimony. Of these photographs, State's Exhibits 359, 364 through 377, and 383 through 391 are gruesome, but not unnecessarily so. They illustrated and supported the coroner's testimony with regard to Back's injuries and the cause of his death. Moreover, with one exception, the photographs of his body all show the wounds after the blood was washed off. As the deputy coroner explained at trial, the photos were selected in order to avoid using "overly graphic or gross" ones.

{¶ 129} Two pairs of autopsy photographs are arguably repetitive. State's Exhibits 367 and 374 both depict Back's left torso and head from slightly different angles, and it is not clear that either one has probative value not also found in the other. State's Exhibits 366 and 372 also appear to be repetitive. The deputy coroner testified that Exhibit 372 features "two wounds that we've already seen" in Exhibit 366. With those exceptions, the autopsy photos are not repetitive or cumulative.

**{¶ 130}** The admission of two pairs of repetitive photographs in this case does not constitute plain error. A showing of plain error requires "a reasonable *probability* that the error resulted in prejudice." (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Thus, Myers would have to show "that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As he makes no attempt to do so, we reject his 15th proposition of law.

## VII. SUFFICIENCY AND WEIGHT OF THE EVIDENCE

**{¶ 131}** Myers's 11th proposition of law asserts that the evidence of guilt at his trial was legally insufficient as to each count and also that his convictions are against the weight of the evidence.

### A. Sufficiency

#### 1. Aggravated Murder

**{¶ 132}** Myers contends that "[t]here was no credible evidence" showing that he engaged in prior calculation and design preceding Back's murder. But when evaluating the sufficiency of the evidence, we do not consider its credibility. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997).

**{¶ 133}** "Prior calculation and design" requires "a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). Myers's words and actions, as Mosley described them and as corroborated by abundant other evidence in the record, show that Myers engaged in such a scheme to kill Back.

**{¶ 134}** Myers emphasizes that he did not know that Mosley had a knife until Mosley pulled it out and began stabbing Back. With respect to prior calculation and design, however, this is beside the point. That the murder was not accomplished in precisely the way he and Mosley had planned does not alter the fact that they did plan it.

**{¶ 135}** Myers also points to Mosley's statement that "[a]t the moment where [Myers] brought up the money and the safe, we had no intentions of killing anybody." But this testimony affects neither the sufficiency nor the weight of the evidence of prior calculation and design. Even if the initial plan was to, as Mosley put it, "get in and get out" and simply rob the Cates house, Mosley's testimony was that Myers later "came up with the idea of killing Justin Back," after their first visit to Back's house on January 27. The pair spent the better part of the day and next morning planning and preparing for the murder.

**{¶ 136}** Myers argues that he did not buy the cold medicine, "bug wash," or syringes. But he tried to purchase these things, and that fact evinces prior calculation and design. He points out that the notebook belonged to Mosley and asserts that it contained only Mosley's thoughts, not those of Myers. But that assertion is inconsistent with the evidence: Mosley testified that his notes reflected their mutual planning and discussion. In short, none of Myers's arguments demonstrate that the evidence of prior calculation and design was insufficient as a matter of law.

*2. Kidnapping*

**{¶ 137}** Myers claims that the state failed to prove kidnapping, specifically the element of restraint, because "[t]he acts constitut[ing] the kidnapping had no significance apart from the murder offenses." Although Myers couches his argument in terms of evidentiary insufficiency, in substance his claim is that the kidnapping was an allied offense of similar import to the aggravated murder and therefore cannot be separately punished. *See generally State v. Ruff*, 143 Ohio St.3d

114, 2015-Ohio-995, 34 N.E.3d 892; *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266.

{¶ 138} Either way, Myers's claim is moot. The trial court merged his conviction on the kidnapping count with his convictions on the aggravated-robbery and aggravated-burglary counts. The court also merged the three felony-murder specifications into a single robbery-murder specification before submitting the case to the jury in the penalty phase. Thus, Myers was not separately punished for kidnapping.

### 3. Other Counts

{¶ 139} Myers contends that the state failed to prove aggravated robbery, aggravated burglary, grand theft of a firearm, evidence tampering, safecracking, and abuse of a corpse, because the state made "no showing that Myers knowingly participated with Mosley" in these acts. He offers no further analysis. We reject these claims: Mosley's testimony and other evidence presented by the state was sufficient to show that Myers acted with the requisite mens rea as to each of these offenses.

### B. Manifest Weight of the Evidence

{¶ 140} A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). Myers contends that his convictions are against the manifest weight of the evidence because they ultimately rest on Mosley's testimony. He insists that Mosley is not credible because he testified against Myers as part of a plea bargain to avoid a death sentence.

{¶ 141} Mosley's plea bargain obviously affects his credibility. But the state's evidence was unrebutted, so there were few if any conflicts in the evidence for the jury to resolve. Moreover, Mosley did not try to minimize his culpability— he admitted that he was the one who stabbed Back—and much of his testimony as to his and Myers's actions during January 27 and 28 was corroborated by other

witnesses, store receipts, and security videos. In addition, the jury was told about Mosley's plea bargain and could use that information in assessing his credibility.

{¶ 142} " 'The discretionary power to grant a new trial' " on manifest-weight grounds " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Based upon our review of the record—including a weighing of the evidence and all reasonable inferences and consideration of the credibility of the witnesses—we cannot conclude that the jury so clearly lost its way as to create a manifest miscarriage of justice. *See Thompkins* at 387. The evidence in this case does not weigh heavily against the convictions. We overrule Myers's 11th proposition of law.

## VIII. PROSECUTORIAL MISCONDUCT

{¶ 143} In his tenth proposition of law, Myers contends that the state engaged in prosecutorial misconduct in closing argument during both phases of trial.

### A. Guilt Phase

{¶ 144} Myers maintains that the two prosecutors who presented the state's closing argument during the guilt phase of the trial improperly (1) vouched for the credibility of the state's witnesses, (2) misstated evidence on two different occasions, (3) shifted the burden of proof to Myers, (4) called upon the jurors to protect society by fulfilling their sworn duty to find Myers guilty, and (5) referred to punishment. Myers did not object to any of the comments that he now claims were improper, so he has forfeited all but plain error.

### 1. Vouching

{¶ 145} It is improper for a prosecutor to vouch for the credibility of a witness at trial. Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue. *See, e.g.*, *State*

*v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232. An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997).

**{¶ 146}** Myers contends that one of the prosecutors vouched for Mosley's credibility in closing argument. He points to the following statements:

> Did [Mosley] have an opportunity to see the things about which he was testifying? He certainly did. Was he consistent? Yes he was. What was his demeanor like? When he came forward * * *, he was very forthcoming.
>
>     * * *
>
>     * * * [I]t's not inconsistent when somebody gives a statement and then at a later point they're asked for further detail and they respond honestly to that further detail and that's what we have in this case. Especially when those details are corroborated again by independent evidence.

**{¶ 147}** None of these comments were improper: they neither implied knowledge of out-of-court information nor placed the prosecutor's own credibility in issue. Instead, the prosecutor's arguments pointed out the strength of Mosley's testimony based on evidence presented in court, not the prosecutor's personal opinion. Each of the comments at issue dealt with considerations that the jury could properly consider in evaluating Mosley's credibility: his demeanor, consistency, and opportunity to observe, as well as the extent to which other evidence corroborated his testimony. Thus, we reject Myers's claim of misconduct by vouching.

### 2. Misstating Evidence

{¶ 148} Myers further contends that the prosecutors misstated the evidence in two instances.

{¶ 149} First, Myers points to a prosecutor's statement: "As Myers tried to restrain [Back], Tim Mosley tried to choke him to death. * * * And when that failed, they turned to the knife." Because the evidence showed that only Mosley stabbed Back, Myers contends that the word "they" was improper. But "[i]solated comments by a prosecutor are not to be * * * given their most damaging meaning." *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 170, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The prosecutor never claimed that Myers wielded the knife. The evidence shows that Myers did participate in the stabbing: he held Back while Mosley stabbed him. And, of course, the stabbing was in furtherance of their *mutual* purpose to kill Back; the prosecutor could justifiably say that "they turned to the knife."

{¶ 150} Second, Myers contends that the other prosecutor misstated the evidence when he said, "And as [Back is] simultaneously being held down by Austin Myers and strangled and stabbed by Tim Mosley, he keeps asking the same question over and over and over again. Why? Why? Please help me. Austin please stop."

{¶ 151} As Myers points out, Mosley did not testify that Back addressed his dying pleas specifically to "Austin" by name. Instead, Mosley testified, "Justin was trying to ask us why, he was pleading to stop and pretty much begging for his life."

{¶ 152} But Myers ignores *his own* statement to police made the day after the murder. Myers admitted that as Mosley was trying to strangle Back, Back said "Please stop" and "*Austin*, help me." (Emphasis added.) The difference between Myers's version and the prosecutor's was trivial. We conclude that Myers has not demonstrated plain error with respect to these comments.

### 3. Shifting Burden of Proof

**{¶ 153}** Myers also contends that the prosecutors' argument improperly shifted the burden of proof to the defense on two occasions.

**{¶ 154}** First, he asserts that the prosecution "improperly made comments that impl[ied] the jury needed to know what Myers was thinking at these proceedings, during and after the alleged murder of Justin Back." But Myers supplies no examples of such comments and provides no citation to the record in support of his contention.

**{¶ 155}** Second, Myers complains that one of the prosecutors pointed out that Myers had first told police that he was not present during Back's murder and had later changed his story. Myers suggests that the prosecutor thereby "implied Myers should have presented an alibi defense if he had one" and sent the jurors the message that Myers needed to prove an alibi defense he never presented in order to be acquitted.

**{¶ 156}** Myers's reading of the state's argument is a stretch. The prosecutor was noting that Myers had initially denied being at the murder scene before changing his story. Pointing out this fact implied nothing about an alibi defense. Nor did it shift the burden of proof. Myers has not demonstrated error.

### 4. "Sworn Duty" Statement

**{¶ 157}** Myers additionally argues that one of the prosecutors acted improperly in telling the jury in closing argument, "But, ladies and gentlemen, it's your sworn duty as jurors, based on the overwhelming evidence and the law, to find Austin Myers guilty of all of the charges." In Myers's view, the reference to the jury's "sworn duty" was improper because it implied that the jury had a duty to convict "in order to serve justice and protect society."

**{¶ 158}** It is not improper for a prosecutor to call on the jury to do its duty by convicting the defendant. "It [is] the jury's duty to convict if the evidence proves guilt beyond a reasonable doubt." *State v. Hicks*, 43 Ohio St.3d 72, 76, 538 N.E.2d

1030 (1989). And contrary to Myers's assertion, nothing in the prosecutor's remarks asked the jury to convict Myers in order to protect society. Myers has demonstrated no error.

### 5. Reference to Punishment during Guilt-Phase Argument

{¶ 159} Finally, Myers contends that the state improperly referred to punishment in the guilt phase by stating: "Your verdict at this time is not about punishment. That will come at a later time. Your verdict is about guilt or innocence only."

{¶ 160} Because "discussion of the death penalty [is] irrelevant" in the guilt phase, it is erroneous for a prosecutor to make references to the death penalty in guilt-phase closing arguments. *State v. Brown*, 38 Ohio St.3d 305, 316, 528 N.E.2d 523 (1988). But here, the prosecutor did not discuss the death penalty. Rather, he correctly stated that the verdict during the guilt phase was not about Myers's punishment. We conclude that Myers has not demonstrated plain error with respect to the comment.

## B. Penalty Phase

### 1. Reasonable-Doubt Argument

{¶ 161} During the penalty-phase closing argument, one of the prosecutors attempted to distinguish between the margin by which the aggravating circumstance was required to outweigh the mitigating factors to justify a death sentence and the level of confidence applicable to the jury's finding that aggravation outweighed mitigation. He said:

> The State has proven its aggravating circumstance beyond a reasonable doubt, but in this sentencing phase, *it is not a matter of proven beyond a reasonable doubt in comparison to the mitigating factors*. In this phase, beyond a reasonable doubt is a measure of your conviction, that you are firmly convinced that the aggravating

circumstance outweighs the mitigating factor[s]. I know that sounds somewhat confusing, but what's important to consider is *you don't have to find that the aggravating circumstance outweighs the mitigating factors by a tremendous degree*, what we would think of as the highest standard in the law. *You only have to find by whatever unit of measurement in your heart and mind that the aggravating circumstance outweighs the mitigating factors and that you are convinced that this is the correct determination.*

(Emphasis added.) Myers asserts that this argument was improper because it encouraged the jury to apply a "lesser legal standard" in determining whether he should receive a death sentence. Defense counsel objected to the prosecutor's argument as a misstatement of the law. As a result, the trial judge instructed: "Ladies and gentlemen, I'm going to ultimately give you the instructions on the law. The attorneys are going to argue what they think the law is." The judge then told the jury that if any statement made during closing arguments did not match the instructions, the jurors were to follow the judge's instructions.

{¶ 162} After the closing arguments, the trial court correctly instructed the jury on the weighing process and specifically on the burden of persuasion. The court instructed:

In order for you to decide the sentence of death shall be imposed upon Austin Myers, the State of Ohio *must prove beyond a reasonable doubt* that the aggravating circumstance of which the defendant was found guilty is sufficient to outweigh the factors in mitigation of imposing the death penalty.

(Emphasis added.) Later, the court instructed:

> If all twelve of you find that the State of Ohio proved *beyond a reasonable doubt* the aggravating circumstance the defendant was guilty of committing is sufficient to outweigh the mitigating factors in this case, then it will be your duty to decide the sentence of death shall be imposed on Austin Myers. If you find the State of Ohio *failed to prove beyond a reasonable doubt* that the aggravating circumstance Austin Myers was guilty of committing is sufficient to outweigh the mitigating factors present in the case, then it will be your duty to decide *which of the * * * life sentence alternatives will be imposed*.

(Emphasis added.)

{¶ 163} Finally, the court instructed: "You should proceed to consider and choose one of the life sentence alternatives if any one or more of you conclude that the State has failed to prove *beyond a reasonable doubt* that the aggravating circumstance outweighs the mitigating factors." (Emphasis added.) Considering the court's instructions to the jury, we conclude there was no error here. *See State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994).

### 2. *Comment on Unsworn Statement*

{¶ 164} During the closing argument of the penalty phase, one of the prosecutors said: "They presented to you the unsworn statement of the defendant. What weight does that have, compared to the statements made by the defendant, to Detective Wyatt and to his own father after his arrest?" The defense did not object.

{¶ 165} Myers contends that the prosecutor's statement "implied that [the unsworn statement] was not as credible as" the testimony of a witness under oath. This contention is incorrect. The prosecutor was not comparing the unsworn statement to any sworn testimony but to Myers's own out-of-court statements to

the police and to his father. Myers also asserts that the prosecutor's comment "denigrated" him for exercising his right to make an unsworn statement, but this claim is not supported by the record. Myers has not demonstrated plain error with regard to the comments.

*3. "Taking Responsibility" Argument*

{¶ 166} In the state's final closing argument, one of the prosecutors tried to explain why Myers is "more worthy of the death penalty than" Mosley. He argued that "Mosley accepted responsibility for his actions" by entering into a plea agreement in which "he agreed that he would spend the rest of his life [in prison] without parole." The prosecutor also said that Mosley "gave a detailed confession" that "pointed out specifically what he had done" and "didn't try to minimize" his actions. The prosecutor then asked the jury to

> [c]ompare that to the unsworn statement of Austin Myers. * * * One thing that you did not hear him do in this statement on that stand, was take responsibility. At no point in time, did he acknowledge that what he did was wrong. * * * Why does [Mosley] get that deal and not Austin Myers? Tim Mosley's taking responsibility.

The defense did not object.

{¶ 167} Myers contends the statement was improper because it "switched [the] burden of proof to Myers." But nothing in the prosecutor's argument at this point addressed the burden of proof, either expressly or by implication.

{¶ 168} Myers also maintains that the prosecutor's argument implied that Myers should be penalized for exercising his right to trial. We disagree. The prosecutor was not criticizing Myers for not pleading guilty. He was calling the jury's attention to Myers's unsworn statement—made *after* the jury had found him guilty—in which Myers failed to accept responsibility.

{¶ 169} Moreover, the prosecutor's argument must be viewed in context. A principal theme of Myers's penalty-phase case for life was that he should be spared death because Mosley was more culpable and yet was not facing a death sentence. Defense counsel declared at the end of his closing argument:

> The prosecutor's office * * * has applied the scales of justice to Timothy Mosley * * * and they've given him the sentence of life without parole. We would ask you to do the same. Don't punish Austin Myers for having gone to trial. Punish Austin Myers commensurate with what Timothy Mosley has received and give him a sentence of life in prison.

{¶ 170} In short, the defense made the Myers-Mosley comparison the keystone of its case for a life sentence. The prosecutor's explanation of why, in the state's view, the comparison was not valid was given to counter the defense's argument and was not improper.

*4. Arguing Facts Not in Evidence*

{¶ 171} Finally, one of the prosecutors stated: "If it wasn't for Austin Myers, Tim Mosley may have never heard the name Justin Back. If it wasn't for Austin Myers, none of you may have ever heard the name Justin Back. If it wasn't for Austin Myers, Justin Back would still be alive today." Myers contends that this argument "improperly speculated on facts not in evidence." Again no objection was made to the statements. We conclude that there was no plain error. The evidence at trial showed that it was Myers who introduced Mosley to Back. Absent that introduction, the murder may not have occurred.

{¶ 172} Myers's tenth proposition of law is overruled.

## IX. SENTENCING ISSUES

### A. Eighth-Amendment Challenge

**{¶ 173}** In his first and second propositions of law Myers contends that his death sentence constitutes cruel and unusual punishment under the Eighth Amendment because his sentence is comparatively disproportionate to the life sentence received by Mosley and because Myers was "a 19 year-old immature adolescent with behavioral issues" when he committed his crimes. His arguments are not persuasive.

**{¶ 174}** Myers concedes that the Eighth Amendment does not require comparative proportionality review in capital cases. *Pulley v. Harris*, 465 U.S. 37, 43-44, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, he argues that imposition of the death penalty is excessive because Mosley was more culpable. But the evidence of Myers's extensive involvement in the planning and execution of Back's murder belies this claim. Moreover, that Myers was not the principal offender—the term "principal offender" refers to the actual killer, *State v. Taylor*, 66 Ohio St.3d 295, 307-308, 612 N.E.2d 316 (1993)—does not preclude a death sentence. *See* R.C. 2929.04(A)(7).

**{¶ 175}** Myers further argues that the imposition of the death penalty is cruel and unusual in his case because he was 19 years old when he committed his crimes and had had some mental-health issues. The Eighth Amendment has been found to prohibit the death penalty for certain types of offenses and certain categories of defendants. Thus, persons younger than age 18 and those who suffer from intellectual disability may not be sentenced to death for any crime. *Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Nor may a state execute a prisoner whose mental illness renders him unable to attain a rational understanding of the meaning and purpose of his execution. *Panetti v. Quarterman*, 551 U.S. 930, 958-960, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

{¶ 176} Although Myers argues that new developments in brain science indicate that age 18 is not the "proper cut off point for the death penalty," he does not propose that the categorical exclusion for those under age 18 be extended to 19 year olds. Nor does he suggest that his mental-health issues growing up rendered him unable to attain a "rational understanding" of the meaning and purpose of his execution, *Panetti* at 959. Instead, he seems to argue that his particular combination of circumstances make the death penalty excessive in his case. Many of the circumstances cited by Myers identify mitigating factors that we will consider in our independent review of the death sentence. But they do not demonstrate a violation of the Eighth Amendment. Accordingly, we overrule Myers's first and second propositions of law.

## B. Sentencing Opinion

{¶ 177} In his 12th proposition of law, Myers contends that the trial court violated R.C. 2929.03(F) by combining its judgment entry with the sentencing opinion in one document. R.C. 2929.03(F) states:

> The court or the panel of three judges, when it imposes sentence of death, shall state *in a separate opinion* its specific findings as to the existence of any of the mitigating factors set forth in division B of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. * * * The judgment in a case in which a sentencing hearing is held pursuant to this section is not final until the opinion is filed [with the clerk of the supreme court].

(Emphasis added.)

{¶ 178} In this case, the trial court filed an opinion captioned: "JUDGMENT ENTRY OF SENTENCE ON AGGRAVATED MURDER WITH DEATH SPECIFICATIONS PURSUANT TO R.C. § 2929.03(F)." (Capitalization sic.) That document constitutes the sentencing opinion required by R.C. 2929.03(F). It set forth the jury's findings on aggravating circumstances and the court's own findings on mitigating factors and explained why the court found that the remaining aggravating circumstance outweighed the mitigating factors.

{¶ 179} The same document also contains the four elements of a final, appealable order under Crim.R. 32(C). It sets forth the fact of the defendant's conviction of aggravated murder and the sentence imposed. The trial judge signed it, it bears a time stamp indicating entry on the journal by the clerk of the common pleas court, and it was filed with the clerk of this court. *See State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, paragraph one of the syllabus. The record contains no other document that would constitute a final, appealable order under Crim.R. 32(C) with respect to the aggravated-murder conviction.

{¶ 180} Myers contends that because R.C. 2929.03(F) specifies that the trial court shall state its findings "in a separate opinion," the sentencing opinion may not be combined with the judgment entry in a single document but must be entirely "separate" from the judgment entry. He points to our statement in *State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 17, that R.C. 2929.03(F) "requires that a separate sentencing opinion be filed in addition to the judgment of conviction." He further maintains that there is no final, appealable order in this case and we must remand for resentencing.

{¶ 181} But nothing in R.C. 2929.03(F) requires that the sentencing opinion be filed in an entry different from the judgment entry. Nor is *Ketterer* to the contrary. In *Ketterer*, we held that "in cases in which R.C. 2929.03(F) requires the

court or panel to file a sentencing opinion, a final, appealable order consists of both the sentencing opinion * * * and the judgment of conviction." *Id.* at ¶ 18.

{¶ 182} But it does not follow that a final, appealable order in a capital case *must be* embodied in two separate documents. Nothing in *Ketterer* prohibits a sentencing opinion from also including a judgment of conviction that is a final, appealable order. Because the sentencing opinion incorporates the elements required by Crim.R. 32(C), it constitutes a final, appealable order. We overrule Myers's 12th proposition of law.

## X. INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 183} In his sixth proposition of law, Myers contends that his trial counsel rendered ineffective assistance during both phases of trial. To establish ineffective assistance, Myers must show (1) deficient performance by counsel, that is, performance falling below an objective standard of reasonable representation, and (2) prejudice—a reasonable probability that, but for counsel's errors, the result would have been different. *Strickland*, 466 U.S. at 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

### A. Discovery

{¶ 184} Myers argues that the allegedly untimely discovery provided by the state and the trial court's denial of a continuance combined to deny him the effective assistance of counsel. He points to statements made by his trial counsel during the proceedings that their representation would be ineffective if they did not have enough time to thoroughly review the discovery provided in the weeks before trial. But despite his counsel's statements, Myers points to nothing in the record showing deficient performance by his counsel with respect to the items turned over during discovery. And even if he could point to deficient performance, he has not shown prejudice.

## B. Guilt Phase

### 1. Decision Not to Cross-Examine Witnesses

**{¶ 185}** Myers complains that his trial counsel declined to cross-examine 13 of the state's witnesses. But "[t]rial counsel need not cross-examine every witness; indeed, doing so can backfire. * * * The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment." *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996).

**{¶ 186}** Defense counsel cross-examined Mosley, the crucial prosecution witness, vigorously and at length. The 13 witnesses whom counsel did not cross-examine gave much less significant testimony.

**{¶ 187}** Myers makes no attempt to explain how trial counsel's decision not to cross-examine the other witnesses was either unreasonable or prejudicial. *Id*. He does not suggest what questions counsel should have asked or what information cross-examination would have elicited. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 272. Nor does he identify any weak spots or contradictions in the testimony of these witnesses that cross-examination might have exposed. Myers has failed to establish that his counsel were ineffective in declining to cross-examine these witnesses.

### 2. Declining to Make an Opening Statement

**{¶ 188}** After the state made its opening statement, defense counsel stated, "[W]e'd like to reserve any opening statement * * * until the beginning of our case." When the state's case-in-chief was finished, defense counsel waived an opening statement and rested without presenting evidence. Myers contends that his counsel rendered ineffective assistance by waiving an opening statement.

**{¶ 189}** But "trial counsel's failure to make an opening statement * * * does not automatically establish the ineffective assistance of counsel." *Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir.2002). Reserving an opening statement at the beginning of trial has the advantage of not disclosing the defense's trial strategy

before the prosecution presents its case. *Id.* And if, as here, the defense ultimately decides not to put on evidence, "an opening statement [is] unnecessary." *Id.*

{¶ 190} Myers argues that declining to make an opening statement was ineffective assistance because counsel thereby failed "to give the jury a clear picture of the case," "to arouse the interest of the jurors in a general theory of the defense," "to build rapport with the jurors," and to let them know "that there [would] be two sides to the case." But such arguments can be made anytime a defense attorney declines to give an opening statement.

{¶ 191} Myers "has not articulated how the absence of an opening statement prejudiced him." *Moss* at 864. Because the defense did not put on a case-in-chief, its case was based on attacking perceived weaknesses in the state's evidence, especially Mosley's testimony. Defense counsel were able to do this in closing argument. Myers's "conclusory allegations are insufficient to justify a finding that an opening statement would have created the reasonable probability of a different outcome in his trial," *id.*

### 3. Breaking a "Promise" to the Jury

{¶ 192} Next, Myers argues that his trial counsel were ineffective because they "told the jury at the beginning" that there would be a defense case and then failed to put on evidence as "promised." Breaking this promise, Myers says, "cost them credibility" and "lost the jury."

{¶ 193} In fact, counsel made no such promise. What counsel said was: "Your Honor, we'd like to reserve any opening statement we give until the beginning of our case, please." Myers reads this as an implied promise that the defense would offer a "case." But it is unlikely that the jury understood it that way. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 283 (statement that jury would "*probably* hear" certain evidence was not a direct promise to present such evidence [emphasis sic]).

{¶ 194} And even if counsel's statement could somehow be interpreted as a promise to offer a case, there is no "*per se* rule that unfulfilled promises * * * will result automatically in a finding of deficient performance of counsel and prejudice to a defendant." *Edwards v. United States*, 767 A.2d 241, 248 (D.C.2001). To justify a finding of prejudice under *Strickland*, a broken promise of this type must be "specific, significant and dramatic." *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 78 (1st Cir.2009).

{¶ 195} Defense counsel's reference to "the beginning of our case" did not include any promise of "specific, significant and dramatic" evidence, witnesses, or testimony. *Compare Lang* at ¶ 284-285 (unfulfilled penalty-phase promise to present evidence that defendant had considered suicide was not shown to be prejudicial) *with English v. Romanowski*, 602 F.3d 714, 729-730 (6th Cir.2010) (unfulfilled promise to call defendant's girlfriend to support self-defense claim was prejudicial), and *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257-259 (7th Cir.2003) (prejudice resulted from unfulfilled promises that defendant would testify and defendant's gang affiliation would be disproved). Hence, we have no basis for finding prejudice.

{¶ 196} Each of Myers's guilt-phase ineffective-assistance claims lacks merit.

### C. Penalty Phase

{¶ 197} Myers contends that his counsel rendered ineffective assistance in the penalty phase by failing to present any expert testimony.

{¶ 198} He asserts that his counsel should have adduced expert testimony to explain the meaning of his self-harming behavior in his early teens and how brain development affects the decision-making of young people. Yet nothing in the record shows what such an expert "would have said in the penalty phase." *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 111. Thus, Myers "has not demonstrated prejudice from missing such testimony," *id*.

{¶ 199} Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674. At trial, the defense requested and received funds to hire a consulting psychologist. The psychologist the defense chose was appointed, but the record does not show what she told Myers's counsel regarding her conclusions. Hence, there is nothing to show deficient performance by counsel.

{¶ 200} Myers's ineffective-assistance claims do not have merit. We overrule his sixth proposition of law in its entirety.

## XI. SETTLED ISSUES

{¶ 201} Myers's 17th and 18th propositions of law raise previously decided issues, which we treat summarily. *See generally State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus; *State v. Spisak*, 36 Ohio St.3d 80, 81, 521 N.E.2d 800 (1988).

{¶ 202} In his 17th proposition of law, he argues that R.C. 2901.05(D)'s definition of "reasonable doubt," which the trial court's instructions conformed to, unconstitutionally reduces the state's burden of persuasion. But, as Myers concedes, we have "repeatedly affirmed" its constitutionality. *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 122. His 18th proposition of law repeats a number of oft-rejected arguments against the constitutionality of the death penalty and the Ohio statutes governing its imposition as well as previously rejected arguments that the death penalty violates obligations under various international charters, treaties, and conventions to which the United States is a party. *See*, *e.g*., *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-120; *Jenkins*, 15 Ohio St.3d at 168-179, 473 N.E.2d 264. The 17th and 18th propositions of law are overruled.

## XII. CUMULATIVE ERROR

{¶ 203} In his 16th proposition of law, Myers claims that the cumulative effect of the errors alleged in this case denied him a fair trial. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. However, because Myers "offers no further analysis, this proposition lacks substance." *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103; *see also State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197. Myers's 16th proposition of law is overruled.

## XIII. INDEPENDENT SENTENCE REVIEW

{¶ 204} R.C. 2929.05 requires us to independently review Myers's death sentence. We must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to death sentences affirmed in similar cases. R.C. 2929.05(A).

### A. Aggravating Circumstances

{¶ 205} The jury found three aggravating circumstances under R.C. 2929.04(A)(7) (murder while committing aggravated robbery, aggravated burglary, and kidnapping). The state elected to proceed on only the aggravated-robbery specification.

{¶ 206} The record supports the jury's finding of this aggravating circumstance. Mosley testified that he and Myers planned to commit robbery by stealing Mark Cates's safe and to kill Back as part of the robbery. The testimony of Mark and Sandra Cates corroborated the aggravated robbery and its connection with the aggravated murder. When they arrived home on January 28, 2014, their son was missing, and so were various items of their property, including the safe.

Police found traces of human blood in the kitchen and living room. Numerous items belonging to the Cateses were discovered when police searched Mosley's garage. And, as already discussed, there was ample evidence of Myers's prior calculation and design.

## B. Mitigating Factors

### 1. Statutory Mitigating Factors, R.C. 2929.04(B)

{¶ 207} Under R.C. 2929.04(B)(4), "[t]he youth of the offender" is a mitigating factor. Born on January 4, 1995, Myers was 19 years and 24 days old at the time of the murder. We find that the (B)(4) factor exists in this case. In addition, the trial court found that Myers had never previously been incarcerated for any reason. We therefore find that the mitigating factor in R.C. 2929.04(B)(5) ("lack of a significant history of prior criminal convictions and delinquency adjudications") exists.

{¶ 208} Under R.C. 2929.04(B)(6), "[i]f the offender was a participant in the offense but not the principal offender," the sentencing authority must consider "the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim." It is undisputed that Mosley was the only one who stabbed Back and that Back died because he was stabbed. Thus, as noted earlier, Myers is not the principal offender, and the (B)(6) mitigating factor must be considered.

{¶ 209} Myers was diagnosed with depressive disorder less than five years before the murder and had engaged in self-harm. Although nothing in the record connects the offense with any "mental disease or defect," R.C. 2929.04(B)(3), we consider Myers's history of depression to be an "other factor" under R.C. 2929.04(B)(7). The mitigating factors in R.C. 2929.04(B)(1) (victim inducement) and (B)(2) (duress, coercion, or strong provocation) do not apply.

*2. Nature and Circumstances of the Offense*

**{¶ 210}** We find that the nature and circumstances of the aggravated murder offer nothing in mitigation.

*3. Offender's History, Character, and Background*

**{¶ 211}** At the mitigation hearing, Myers called three witnesses: Danielle Copeland, his mother, Gregory Myers, his father, and one of his younger brothers. Myers also made an unsworn statement.

**{¶ 212}** Myers is the oldest of the five children of Danielle and Gregory. His mother described his childhood as normal. Both parents testified that they tried to teach him right from wrong, disciplining him when he needed it. He developed an early interest in the piano, "had a great ear for music," took lessons, and performed at recitals. He was classified as "gifted" in many areas. Before Myers entered the fifth grade, he tested in the 98th percentile nationally in math and science, in the 99th percentile in reading and writing, and in the 97th percentile in social studies.

**{¶ 213}** Gregory and Danielle's marriage began to deteriorate in 2006; by the end of 2007, Danielle considered their relationship over. Danielle had an affair with a coworker and became pregnant. Gregory moved out in July 2009, when Myers was 14, and the couple later divorced.

**{¶ 214}** Meanwhile, Myers developed behavior problems. His grades declined, and in May 2009, he briefly ran away from home. The police officer who brought him home informed his mother that Myers had told the officer that Myers had been cutting himself and shooting himself in the legs with a pellet gun.

**{¶ 215}** Danielle took him to Kettering Behavioral Medicine Center Youth Services, an inpatient facility, where he stayed for a week. He was diagnosed with "depressive disorder not otherwise specified" and "substance induced mood disorder" involving abuse of Benadryl and was prescribed Risperdal and Prozac. His mother testified that the medications seemed to help.

**{¶ 216}** While at Kettering in 2009, Myers told a doctor that his father had physically abused him. But this claim was disputed by both parents.

**{¶ 217}** In August 2009, Myers sought and received his mother's permission to move in with his father. After Myers moved in with his father, his father took him off his medications and discontinued his psychological counseling. Myers's mother felt that he needed more structure and "management" than his father gave him.

**{¶ 218}** Myers's parents and brother all testified about his strong family relationships. He loved and was loved by his siblings and his step-siblings and provided them with guidance, advice, and emotional support. He continued to communicate with his family while in jail.

### 4. Remorse

**{¶ 219}** In a brief unsworn statement, Myers apologized to Back's family and expressed sympathy for their "pain and suffering." He said that his execution would not "fix anything" or "bring Justin back" but would "only * * * cause more pain and suffering" to innocent people: his parents, brothers, and sisters. Myers said: "I don't want to hurt people. I am not asking you to spare my life so I can hurt anyone. I want to help people. I want to help stop tragedies like this from happening." He asked for "a chance for me to become a better person."

### 5. Sentence Evaluation

**{¶ 220}** We find little in Myers's history, character, and background that is mitigating. He came from a broken home, and the circumstances under which his parents divorced must have been painful. But he had a loving family and a middle-class upbringing that included taking music lessons. He was also a gifted student. He had advantages in life that few capital defendants have had.

**{¶ 221}** We do give weight to the fact that Myers has the love and support of his family and to his lack of a significant criminal or juvenile record. *See*, *e.g.*, *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 196 (love

and support of family); *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 280 (lack of significant record). His expression of remorse, however, deserves little weight. *See State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 113.

{¶ 222} The R.C. 2929.04(B)(6) factor, degree of participation, is not entitled to significant weight on the facts of this case. Even though Myers did not inflict the fatal wounds, he had a large role in the offense. He came up with the idea of stealing the safe and of killing Back to get it. He chose that as an easy way to make some money over the alternative of robbing or burglarizing a drug dealer. He rejected Mosley's proposal to burglarize the Cateses' house on January 27, when they knew no one was home. He came up with the initial idea of killing Back, and he brainstormed with Mosley to arrive at the plan of making and using a garrote. He bought the materials to make the garrote.

{¶ 223} Myers also extensively participated "in the acts that led to the death of the victim." *Id*. He restrained Back while Mosley slipped the garrote over Back's head and continued to restrain him when Mosley, having failed in his attempt to strangle Back, pulled his knife and began stabbing him.

{¶ 224} Myers's strongest mitigating factor is his youth. He was just past his 19th birthday when he committed the murder. "This factor is entitled to some weight, especially since eighteen is the minimum age for death penalty eligibility." *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 98.

{¶ 225} In a recent case, *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, an offender who committed murder at age 19 successfully argued that the aggravating circumstances in his case did not outweigh the mitigating factors. But in *Johnson*, the mitigating factor of the defendant's youth was joined with the mitigating factors that he had a "corrosive upbringing," *id*. at ¶ 138, by a clan of criminals who taught him to "lead a criminal lifestyle," *id*. at ¶ 137, he had a low IQ, *id*. at ¶ 121, 135, and he had been abused and neglected.

Also, his family members were addicted to drugs and alcohol and had "mental-health issues," *id*. at ¶ 137. Johnson's upbringing contrasts starkly with Myers's background.

{¶ 226} We find that the mitigating factors collectively deserve, at most, modest weight in this case. Accordingly, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

### C. Proportionality Review

{¶ 227} Finally, we find that the death sentence is not disproportionate to sentences imposed in similar cases. R.C. 2929.05(A). This court has affirmed death sentences imposed on other defendants who were 19 years old when they committed murder and who were found guilty of only one robbery-murder aggravating circumstance. *State v. Woodard*, 68 Ohio St.3d 70, 79, 623 N.E.2d 75 (1993); *State v. McNeill*, 83 Ohio St.3d 438, 453-454, 700 N.E.2d 596 (1998).

{¶ 228} Although Myers argues that his death sentence is disproportionate to Mosley's life sentence, we reject this argument. Cases of defendants who did *not* receive a death sentence at trial—including codefendants—are not "similar cases" to be included in the statutorily mandated proportionality review. *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 94.

{¶ 229} Myers cites *State v. Getsy*, 84 Ohio St.3d 180, 702 N.E.2d 866 (1998), to support his assertion that "[t]his Court has recognized the extreme unfairness of a co-defendant receiving a lesser sentence when he is the principal offender." But that is not what happened—indeed, it is the converse of what happened—in *Getsy*.

{¶ 230} In that case, the principal offender, Getsy, was the one who received a death sentence. Although this court affirmed his death sentence, the court thought it "troubling" that Getsy's codefendant, who was *not* a principal offender, "did not receive the death sentence even though he initiated the crime." *Id*. at 209. Thus, to the extent that *Getsy* is relevant here, it supports a proposition

distinctly unhelpful to Myers: the person who instigates and plans an aggravated murder may be at least as culpable as the one who actually carries it out.

## XIV. CONCLUSION

{¶ 231} We find no reversible error in the proceedings below.  We affirm the judgments of conviction and the sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, FRENCH, RICE, and FISCHER, JJ., concur.

CYNTHIA W. RICE, J., of the Eleventh District Court of Appeals, sitting for O'NEILL, J.

_____

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Timothy J. McKenna and Roger W. Kirk, for appellant.

_____