[Cite as *In re J.C.*, 2021-Ohio-1476.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

IN THE MATTER OF:

J.C. III, B.R., F.R.,

DEPENDENT CHILDREN.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MO 0012**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio, Juvenile Division
Case No. 2018 DNA 5633

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. James L. Peters*, Monroe County Prosecutor, *Atty. Jamie Riley Pointer*, Assistant Prosecutor, 101 North Main Street, Room 15, P.O. Box 430, Woodsfield, Ohio 43793-0430, for Plaintiff-Appellee and

*Atty. Rhonda Santha,* 6401 State Route 534, West Farmington, Ohio 44491, for Defendant-Appellant.

Dated:  April 14, 2021

_____

**D'APOLITO, J.**

{¶1}    Appellant, S.K. ("Mother") appeals the judgment entry of the Monroe County Court of Common Pleas, Juvenile Division, granting legal custody of the child, J.C. III (son - d.o.b. 11/19/12) to his paternal grandparents, and permanent custody of the children, B.R. (son - d.o.b. 5/13/14) and F.R. (daughter - d.o.b. 6/22/15) to the Monroe County Department of Job and Family Services ("DJFS" or "agency").  For the following reasons, the judgment entry of the juvenile court is affirmed.

## LAW

{¶2}    A parent's right to raise his or her child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).  However, the government has authority to enact laws allowing an agency to intervene to protect children. See *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio 1104, ¶ 28, 862 N.E.2d 816.  Therefore, a parent may lose custody of a child to a non-parent if a court finds the parent unsuitable. *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus.

{¶3}    Accordingly, in child custody proceedings between a parent and nonparent, a court may not award custody to the nonparent "without first determining that a preponderance of the evidence shows that the parent abandoned the child; that the parent contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child." *Id.*; *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, syllabus.  A preponderance of the evidence is evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.  In other words, evidence that, as a whole, shows that the fact sought to be proved is more probable than not, or evidence that is more credible and convincing to the mind. *JAD Rentals of Youngstown, LLC v. Cox*, 7th Dist. Mahoning No. 19 MA 0096, 2021-Ohio-304, ¶ 20.

{¶4}    In the absence of a non-parent seeking custody, R.C. 2151.414 sets out specific findings a court must make before granting an agency's motion for permanent

custody of a child. *In re C.F., supra*, ¶ 22. First, an agency that seeks permanent custody of a child bears the burden of proving that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies.

{¶5} R.C. 2151.414(B)(1)(d) reads, in its entirety:

> The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

There is no dispute that the children have been in the temporary custody of the DJFS for at least twelve months of a consecutive twenty-two-month period.

{¶6} Next, the agency bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. R.C. 2151.414(D)(1) sets out a nonexhaustive list of factors the court must consider, and the court is encouraged but not required to address the factors relevant to the decision. R.C. 2151.414(D)(1) reads, in pertinent part:

> In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[1]

{¶7}   Clear and convincing evidence is that amount of proof which can "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The standard "does not mean clear and unequivocal." *Cross,* 161 Ohio St. at 477. The clear and convincing standard requires more than the preponderance of the evidence standard but less than the beyond a reasonable doubt standard applicable to criminal cases. *Id.*  A juvenile court is not required to make specific findings as to each best interest factor; rather, the juvenile court need only indicate that it considered the factors set forth in R.C. 2151.414(D)(1).  *Matter of D.F.,* 7th Dist. Noble No. 16 NO 0439, 2017-Ohio-2711, ¶ 38-39.

{¶8}   A determination of legal custody by the juvenile court will only be reversed for an abuse of discretion. *In re C.A.C.J.,* 7th Dist. Belmont No. 18 BE 0010, 2018-Ohio-4501, ¶ 7.  The same is true with respect to the juvenile court's decision with respect to a motion for permanent custody.  *In re C.F., supra,* ¶ 48.  An abuse of discretion occurs if the court's decision is unreasonable, arbitrary or unconscionable; it involves more than

---

[1]The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent withholding medical treatment or food from the child; a parents repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent abandoning the child; and a parent having had parental rights as to the child's sibling involuntarily terminated. None of the R.C. 2151.414(E)(7) through (11) factors are relevant here.

an error of judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶9}    Further, as "[c]ustody issues are some of the most difficult and agonizing decisions a trial judge must make," the trial court is given "wide latitude in considering all the evidence." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). We must presume that the trial court's findings are correct because the trial court is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Therefore, deferential review in a child custody determination is especially crucial "where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis* at 419.

## FACTS AND PROCEDURAL HISTORY

{¶10} On February 20, 2020, DJFS filed motions seeking an order granting permanent custody as to B.R. and F.R. to DJFS, and legal custody as to J.C. III to his paternal grandparents, J.C. and A.C, or, in the alternative, permanent custody of J.C. III to the agency. On July 17, 2020, the Guardian Ad Litem ("GAL") filed a motion seeking an order granting permanent custody of all of the children to DJFS. At the hearing on the motions conducted on July 24, 2020, the juvenile court accepted the testimony of five witnesses, Jessica Murphy, a social service worker at DJFS, A.C., J.C. III's paternal grandmother, S.E., the children's foster mother, Chelsea Bone, the GAL, and J.C. II, J.C. III's father.

{¶11} At the time of the hearing, all three of the children were living with the same foster parents, S.E. and St. E. J.C. III and B.R. were placed with the foster parents on July 18, 2019, roughly a year before the hearing. F.R. was originally placed in a foster home separate from her brothers, but was reunited with them when she was placed with S.E. and St. E on January 30, 2020, roughly seven months before the hearing.  (Tr., 87.)

{¶12} Mother did not attend the hearing.  Her counsel explained prior to the commencement of testimony that Mother, who was residing in Steubenville, had "car

trouble" and she was "attempting to get her [sic] as quickly as possible." (7/24/20 Hearing Tr., 5.)

**{¶13}** When the juvenile court asked Mother's counsel if she was aware of Mother's estimated time of arrival, Mother's counsel responded, "I do not, but she is coming from Steubenville, so it might be a little lengthy." The trial court replied, "All right. I am going to go ahead and proceed. This has been scheduled for a long time. And so I am going to go ahead and proceed." (Tr., 6.) The juvenile court appears to be referring to the fact that the hearing on the motions was originally scheduled for April 24, 2020, and was continued twice, to June 6, 2020 and then July 24, 2020 due to COVID-19 restrictions.

**{¶14}** Mother's counsel did not call any witnesses at the hearing. At the conclusion of the hearing, in recognition of Mother's failure to appear, the juvenile court remarked that "everybody in this room is aware of her background, and her upbringing as well, and basically she has never been provided the tools that she needed to adequately address the issues these children have." (Tr., 223.)

**{¶15}** According to the judgment entry dated August 3, 2020, Mother contacted her counsel at 7:00 a.m. on the day of the hearing, which was scheduled for 9:00 a.m. Mother stated that she "was in Steubenville (two hours away) and was having car trouble." (8/3/2020 J.E., p. 2). When the hearing concluded at 12:30 p.m., Mother still had not appeared.

**{¶16}** The juvenile court observes in the judgment entry that no motion for continuance of the hearing was made by Mother's counsel, but that the juvenile court would have denied any such motion based upon Mother's failure to appear for scheduled court appearances in the past. The juvenile court did not memorialize Appellant's previous nonappearances in the judgment entry. According to the pro se notice of appeal, Mother's counsel was aware one week prior to the hearing that Mother was unable to attend the hearing due to transportation issues.

**{¶17}** Despite the fact that B.R. and F.R. share the same surname, they have different fathers. Neither B.R.'s father, D.A., nor F.R.'s father, Sh. E, was actively involved in his child's life during the pendency of the juvenile proceedings or participated in the case plan formulated by DJFS.

{¶18} Although F.R. was initially placed with Sh. E., he chose to leave the state roughly seven days later.  As a result, DJFS took F.R. into custody.  Although Sh. E. repeatedly requested that F.R. be placed in his care, he failed to fulfill service provider records requests or complete a mental health assessment required by DJFS.  (Tr., 10-11.)

{¶19}  The only inquiry received by Murphy regarding B.R. was a request by D.A. through a Defiance County homeless service representative.   The representative explained that D.A.'s interest in custody of B.R. was based on a contingency that D.A. could only acquire housing through the homeless service if a minor was living with him. (Tr., 9.)

{¶20} At the time the hearing was conducted, J.C. III's father, J.C. II was incarcerated for a probation violation, but he expressed his intention to regain custody of J.C. III upon his projected release date in January of 2021. During his incarceration, J.C. II maintained weekly contact via telephone with J.C. III.

{¶21} The children were removed from Mother's care on October 11, 2018. According to the ex parte emergency shelter care order, Mother's landlord entered the home to conduct an inspection after the home had been sold.  The landlord reported deplorable and unsanitary conditions in the home to DJFS.  When representatives from DJFS arrived, they discovered squalor, moldy food in the sink, a filthy toilet, and insect infestation in the beds.

{¶22}  Mother reported that the children had been staying with J.C. II, but that they were at the home of M.B., Mother's aunt, at the time DJFS arrived.  Mother had previously been forbidden from taking the children to M.B.'s home due to a roach infestation.  As a consequence, the children were physically removed from M.B.'s house.

{¶23}  When the children were removed from Mother's care, they were between the ages of three and five.  None of the children were toilet-trained.  (Tr., 34-37.)  Murphy testified that the children were hyperactive, non-verbal, and demonstrated developmental delays, which indicated a need of counseling and speech therapy.  (Tr., 31, 36.)  For instance, C.J. III, who was roughly one month short of his sixth birthday, made a "clicking noise" in lieu of words when he interacted with DJFS employees. (Tr., 37.) S.E. testified that B.R., who was five years of age, was like an infant when he was placed with her.

With the sole exception of feeding himself, he was incapable of self-care. Murphy explained that she had consistently encouraged Mother to seek counseling and therapy for the children, to no avail. Four-year-old F.R.'s physical hygiene was poor, and she had an open abrasion on her forehead.  (Tr., 30.)

**{¶24}** On October 12, 2018, a complaint was filed alleging dependency and neglect.  At a pretrial hearing on October 23, 2018, Mother stipulated to the dependency count and the neglect count was voluntarily dismissed by DJFS. Temporary custody of the boys was awarded to J.C. II, and temporary custody of F.R. was awarded to DJFS.

**{¶25}** Around that same time, Murphy established a case plan for Mother. The case plan was relatively simple, it required that she obtain appropriate housing, maintain a safe and sanitary home, and attend parenting classes in order to regain custody of her children.

**{¶26}** Roughly one year later, Murphy added a mental health assessment to the case plan.  She testified at the hearing that the assessment had not been completed. (Tr., 19.)  However, a Mental Services Summary Report dated June 10, 2020, establishes that Mother was evaluated by a therapist with Coleman Professional Services in Jefferson County. The report is attached to the July 17, 2020 correspondence from Appellee's counsel to the other parties in this case.  The report states that Mother had a diagnostic assessment on June 5, 2020 and that her attitude and performance were excellent.  The only additional information provided is that Mother was cooperative and friendly and intended to continue individual counseling.  Because the hearing on the motions was conducted one-week after the report was sent to the parties, Murphy was likely unaware of it.

**{¶27}** On January 7, 2019, the juvenile court granted an emergency ex parte motion filed by the GAL to remove the boys from J.C. II's care based on injuries sustained by B.R.  In a judgment entry dated January 29, 2019, Mother and J.C. II stipulated to DJFS's temporary custody of all three of the children.

**{¶28}** Although the accusation of abuse was not substantiated by a medical examination, the juvenile court was notified a few months later that J.C. II had been charged with a drug-related parole violation and that he anticipated the imposition of a six-month jail sentence.  Because Mother had yet to secure adequate housing, temporary

custody of the boys was continued with DJFS on May 7, 2019. Mother completed parenting classes in May of 2019. (Tr., 15.)

{¶29} According to Murphy's testimony, housing was a habitual problem for Mother throughout the pendency of the juvenile court proceedings. She changed her residence roughly five times – two residences of her own, and three belonging to boyfriends – during the twenty-one months between the establishment of the original case plan and the hearing. When Murphy conducted visits of several of the foregoing residences, she discovered that the homes were in complete disarray, had bug infestations, and would not provide a stable, safe living environment for the children. (Tr., 16, 27.)

{¶30} Murphy conceded that it was very difficult for Mother to find appropriate housing in Monroe County. Murphy testified that she "helped [Mother] look for housing for months." (Tr., 67.) As a consequence, DJFS provided financial assistance to Mother, which allowed her to obtain housing in Belmont County in the fall of 2019. During that time, she briefly regained custody of F.R. only, from 8/2/19 to 9/19/19, because the residence was not large enough to accommodate all three of the children. F.R. was returned to the temporary custody of DJFS due to Mother's accusations of sexual abuse of F.R. against her boyfriend, S.O. (Tr., 15.)

{¶31} Mother was evicted from the Belmont County residence based on her failure to pay the rent. The only rental payment made on the home was made by DJFS. DJFS's last home visit with Mother was at the Belmont County residence in September of 2019. (Tr., 64.)

{¶32} Mother informed Murphy at a juvenile court hearing in January of 2020 that Mother was residing in Steubenville with relatives of a boyfriend, R.J. and that she intended to move into an apartment on Linden Avenue. (Tr., 60-61.) Mother provided authorization via Facebook Messenger to Murphy to perform a background check on R.J., however Murphy informed Mother that R.J. must appear for a face-to-face interview at DJFS.

{¶33} DJFS shut down its offices due to the COVID-10 pandemic in March of 2020. (Tr., 68.) A notice of the hearing on the motions originally set for April 24, 2020,

which was sent by the juvenile court to the Linden Avenue address, was returned to the juvenile court and marked "undeliverable." (Dkt. #196.)

{¶34} On April 23, 2020, Mother reported that she was in the process of arranging the utilities connections at the Linden address. (Tr., 62.) Murphy testified that she had communicated with Mother several times to arrange a home visit at the Linden residence to no avail. Murphy further testified that "driving to Steubenville on an off chance that [Mother] is there is not something that [DJFS] has the means to do." (Tr., 64.)

{¶35} As a consequence, Murphy asked a representative from the child services department in Jefferson County to conduct a safety evaluation of the Linden address. Although a child services representative from Jefferson County went to the residence and engaged in a face-to-face visit with Mother, the representative did not conduct the safety evaluation. (Tr., 66.)

{¶36} Murphy left DJFS in May of 2020 on maternity leave. (Tr., 66.) However, Murphy testified that her supervisor would have conducted the safety check on the Steubenville residence in Murphy's absence, but Mother's electronic mail communications, "which [Mother] had consistently done for a very long time" ended in April of 2020. (Tr., 62, 69.) Murphy stated that Mother had continuous involvement with DJFS long before the initiation of the above-captioned case and was well-aware of her obligation to maintain contact with the agency. (Tr., 68.)

{¶37} According to Murphy, Mother reported that she had nine jobs in the twenty-one months between the establishment of the case plan and the hearing. Although employment was not an expressed goal in the case plan, it was significant as it facilitated Mother's ability to obtain and maintain a residence for the children. Murphy testified that she got "a lot of conflicting information" from Mother and could not confirm her alleged employment, with the exception of paystubs provided by Mother when the children were originally taken into custody by DJFS. (Tr., 20-21.)

{¶38} From September of 2019 to the date of the hearing, Mother had no face-to-face contact with representatives of DJFS, with the exception of two supervised visits at the Agency with the children. (Tr., 16.) Murphy testified that she made numerous telephone requests of Mother to maintain regular face-to-face contact with DJFS in order to work the case plan. However, telephone calls frequently went unanswered, or Mother

scheduled visits then asserted that work conflicts or "car trouble" prohibited her from attending the meetings. (Tr., 17.) Murphy explained that Mother maintained electronic mail or Facebook Messenger contact, but "that's not adequate enough to work a case plan with someone." On the occasions when Murphy communicated with Mother, Mother did not initiate conversations about the children. (Tr., 19, 70-71.)

{¶39} In the twenty-one months between the establishment of the case plan and the hearing, Mother visited with the boys eight times, F.R. four times, and all three of the children as a group four times. (Tr., 21-22.) Although the boys' foster parents lived roughly two and a half hours from DJFS, Murphy encourage Mother to schedule visits at the agency. Murphy testified that Mother's visits with the children were "hit or miss." (Tr., 18.) S.E. testified that she invited Mother to attend the children's mental health appointments, and, on two occasions, scheduled the appointments based on Mother's schedule, but Mother did not attend. (Tr., 143.)

{¶40} Mother had three supervised visits at the agency with the children since July of 2019 – in August and September of 2019, and February of 2020. (Tr., 140-141.) As of the date of the hearing, Mother had not requested visitation with the children since her last supervised visit on February 26, 2020.

{¶41} Mother brought her boyfriends to the visits, and she was accompanied by other men as well. Mother asked if the men could join her and the children in the visitation room, despite the fact that she had been told that a face-to-face meeting at DJFS was required for anyone who wanted to participate prior to the supervised visitation. (Tr., 76.)

{¶42} S.E. testified that F.R. did not recognize Mother at the February 26, 2020 visit. J.C. III was overcome with emotion when he saw Mother. He "curled up in a ball and put his face down." (Tr., 23.) Mother calls J.C. III by a nickname that J.C. III does not like, and despite the suggestion that J.C. III would be more amenable to joining Mother in the visitation room if she stopped using the nickname, she persisted. (Tr., 22.) J.C. III refused to go to the visitation room with Mother until S.E. assured him that she would return to DJFS in an hour and he would return home with her. (Tr., 24.)

{¶43} Mother argues in her appellate brief that she visited the children regularly until the COVID-19 outbreak. She asks us to take judicial notice of statewide shutdown of state agencies and local businesses that occurred in the wake of the pandemic in

March of 2020. The only evidence in the record regarding the agency's COVID-19 protocol is that the agency ceased face-to-face contact in March of 2020, but that the agency continued verbal and e-mail communications.

**{¶44}** Mother argues that, in lieu of actual visits or telephone calls, she relied on recorded messages sent through a social media application called "Marco Polo." The recorded messages were sent with no set schedule, some were sent weekly while others were sent twice in one week. Typically, when more than one message was received in one week, no messages were sent for the following couple of weeks.

**{¶45}** According to S.E.'s testimony, the children are high-energy and it is difficult for them to sit through the brief video messages, which typically contained the same limited content. Although the children were interested in communicating with Mother in the beginning, after lengthy periods with no contact, "that bond went away." (Tr., 147.) S.E. testified that the children have lost their connection to Mother, and now call her by her first name. (Tr., 137-138, 147.) S.E. further testified that the children "don't care" about the videos. (Tr., 1388.)

**{¶46}** S.E. regularly explains to the children that she and St. E. are not their biological parents, and she initially discouraged the children from calling them "Mommy" and "Daddy." However, after the supervised visit at the agency in September of 2019, J.C.III. began calling them "Mommy" and "Daddy." (Tr., 140.) J.C. III refers to both St. E. and J.C. III as "Daddy," and explains that he has two daddies. (Tr., 143.) B.R. began referring to the foster parents as "Mommy" and "Daddy" in step with J.C. III. F.R. has called the foster parents "Mommy" and "Daddy" from the day that she was placed with them. (Tr., 155.)

**{¶47}** Murphy testified that the children are thriving in their foster home. At the time of the hearing, both boys were toilet-trained and attending elementary school. They each have an IEP, are on medication management, and receive counseling and speech therapy. (Tr., 34-35, 37-38.) F.R.'s verbal and social skills were improved and she was "a lot calmer." (Tr., 30.) All of the children are able to focus.

**{¶48}** S.E. testified that F.R., who was initially aggressive with other children, is displaying compassion toward them, which S.E. attributed to the security that F.R. derives from the foster home. (Tr., 119.) B.R., who was non-verbal and incapable of dressing

himself, is able to dress himself and express himself, occasionally in sentences. He was also prescribed "heavy medication" when he arrived at the foster home, but has been weaned from that medication and is now capable of managing his emotions. (Tr., 122.)

{¶49} J.C. III was non-verbal and exhibited fear and anger when he was first placed with the foster parents. S.E. testified that J.C. III frequently took toys and trinkets and hid them, and had to be first in line for everything for fear of being forgotten. (Tr., 127-129.) He had a "complete meltdown" at shower and bath time. (Tr., 128.) J.C. III bathes and dresses himself and his communication skills are improving. Although S.E. still struggles to understand J.C. III, she attributed his communication problem to his excitement in expressing himself, rather than the developmental delays suffered by B.R.. (Tr., 131.) S.E. characterized J.C. III as "very smart."

{¶50} Murphy testified that J.C. III was happy and content during his supervised visits with his paternal grandparents at DJFS. (Tr., 48, 86.) A.C., J.C. III's paternal grandmother, testified that she and J.C. III's paternal grandfather have had regular weekend-long visits with J.C. III in their home since June. (Tr., 103.) They have dedicated a room in their three-bedroom trailer to J.C. III and signed a statement of understanding, which outlines their responsibilities when J.C. III is in their care. (Tr., 100.)

{¶51} At the time of the hearing, J.C. III's paternal grandparents had custody of another one of their grandchildren, an eleven-year-old girl. A.C. planned to make arrangements for therapy and counseling at the same hospital where her granddaughter receives those services. (Tr., 101.) A.C. testified that J.C. III is very talkative and she can understand roughly 80% of his verbal communication. When she struggles to understand him, they "figure it out." (Tr., 104.)

{¶52} The GAL recommended that all three of the children should be placed in the permanent custody of DJFS. The GAL expressed grave concern over any division of custody due to the fact that the brothers have never been separated. She also cited the strong bond that had developed between J.C. III and the foster parents. The GAL conceded that she had not seen J.C. III interact with his paternal grandparents and had no reason to question their affection or ability to care for him. (Tr., 190, 195.)

{¶53} At the hearing, the juvenile court expressed an inclination to grant permanent custody of J.C. III to DJFS, in order to keep the siblings together and maintain

Case No. 20 MO 0012

the existing bond between J.C. III and the foster parents. However, the juvenile court recognized the statutory duty to grant legal custody to a relative instead of DJFS. The juvenile court further observed that legal custody was the least restrictive alternative available, as it would not foreclose J.C. II's ability to regain custody of his son in the future.

**{¶54}** In the August 3, 2020 judgment entry, the juvenile court predicated the termination of Mother's parental rights on the "overwhelming" evidence in the record of her failure to comply with the case plan, failure to provide adequate housing, failure to maintain a clean and safe environment, failure to visit with the children, and failure to participate in both the case plan and the above-captioned legal proceeding. (8/3/2020 J.E., p. 3). The juvenile court predicated the award of legal custody of J.C. III to his paternal grandparents on R.C. 2151.414(D)(1)(d), which requires the juvenile court to consider "[t]he child's need for a legally secure permanent placement and whether that type placement can be achieved without a grant of permanent custody."

**{¶55}** Further, R.C. 2151.414(D)(2) reads, in relevant part:

(2) If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:

* * *

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

**{¶56}** This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

**APPELLANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY COUNSEL'S FAILURE TO REQUEST A CONTINUANCE OF THE PERMANENT CUSTODY HEARING UNTIL APPELLANT'S PRESENCE COULD BE SECURED.**

**{¶57}** Mother's first assignment of error challenges her trial counsel's failure to request a continuance of the July 24, 2020 hearing. Ineffective assistance of counsel involves a demonstration of deficient performance by counsel in that counsel's performance fell below an objective standard of reasonable representation and prejudice, which involves a reasonable probability the result would have been different but for counsel's errors that deprived the defendant of a fair trial. *In re K.E.*, 7th Dist. Mahoning No. 17 MA 0144, 2018-Ohio-3100, ¶ 19, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 82 (2016).

**{¶58}** However, the juvenile court anticipated the possibility of an appeal based on trial counsel's failure to request a continuance and stated on the record that he would have overruled such a motion had it been made. As a consequence, Mother argues, in the alternative, that the juvenile court abused its discretion.

**{¶59}** "The determination whether to grant a continuance is entrusted to the broad discretion of the trial court." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 147, citing *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus; accord *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 92. In this context, an abuse of discretion is an "unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Kirkland*, 140 Ohio St.3d 73, 15 N.E.3d 818, 2014-Ohio-1966, ¶ 67, quoting *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

**{¶60}** A trial court that is considering a motion to continue should "[w]eigh[ ] against any potential prejudice to a defendant * * * concerns such as a court's right to control its own docket against the public's interest in the prompt and efficient dispatch of justice." *Unger*, 67 Ohio St.2d at 67, 423 N.E.2d 1078. A court also should consider:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a

continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68; accord *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 147; *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 45. Additionally, with respect to the continuance of juvenile court hearings, Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."

**{¶61}** Appellee argues that the juvenile court did not abuse its discretion in denying the potential motion for a continuance. Appellee alleges in its brief that Mother failed to appear for other hearings in the case, without identifying the hearings at which Mother failed to appear. Having reviewed the record, we note that none of the journal entries reflect Mother's failure to appear at a hearing. However, the January 2, 2020 journal entry, which memorialized J.C. III's paternal grandparents as a potential kinship placement, reads, in pertinent part, "Mother's whereabouts are unknown."

**{¶62}** In the pro se notice of appeal, Mother states that her trial counsel was aware of her inability to attend the hearing one week prior to the hearing. She writes, "On July 24, 2020, I was unable to make it to the court hearing due to vehicle issues, and I was unable to find someone to bring me. My lawyers [sic] office had known for over a week before the court hearing."

**{¶63}** Mother was on notice as of May 11, 2020 that the hearing was continued to July 24, 2020. She had over two months to arrange transportation to the hearing. Even assuming that she did not have the use of her personal automobile, her statement in the notice of appeal establishes that she knew about her transportation problem a full week in advance of the hearing, but did not make alternative arrangements to appear.

**{¶64}** Further, the juvenile court was in the best position to adjudge Mother's credibility as to her failure to appear. Based on Murphy's testimony that Mother commonly scheduled appointments with the children, then cancelled at the last minute due to alleged transportation problems, we find that the juvenile court did not act arbitrarily in refusing to continue the hearing.

**{¶65}** While we are cognizant that Mother's failure to maintain contact with DJFS coincided with the onset of the pandemic, we find that the exigencies resulting from the

COVID-19 restrictions did not prevent her from maintaining contact with the agency or her children, or attending the hearing. As a consequence, we find that the juvenile court did not abuse its discretion is declining to reschedule the hearing, and, therefore, Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**TRIAL COURT'S FINDING OF CLEAR AND CONVINCING EVIDENCE IN PERMANENT CUSTODY CASE WHICH TERMINATED APPELLANT'S PARENTAL RIGHTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶66} As previously stated, we review the juvenile's court's decision awarding permanent custody of B.R. and F.R. for an abuse of discretion. *In re C.F., supra*, ¶ 48. In her second assignment of error, Appellant contends that the COVID-19 pandemic prohibited her from face-to-face meetings with her children, and, as a consequence, she was relegated to exchanging videos with the children, which she did with regularity since the outbreak in February of 2020. She further alleges that she has maintained the same residence on Linden Avenue in Steubenville since April of 2020, but Murphy failed to visit the residence due to COVID-19 restrictions and/or Murphy's maternity leave, both events having roughly coincided with Appellant's acquisition of the residence in the spring of 2020.

{¶67} Although the requirements of the case plan were elementary, Mother demonstrated a marked inability to maintain a clean and stable residence suitable for the children throughout the twenty-one months between the establishment of the original case plan and the hearing. Mother's home at the time of the children's removal was filthy and bug infested. Further, Murphy testified that the residences inhabited by Mother following the institution of this case had consistently suffered from the same defects.

{¶68} Mother's trial counsel argued that the Linden Avenue apartment was suitable for the children and that DJFS was at fault for failing to conduct a safety inspection. However, the record establishes that Murphy told Mother that R.J. was required to appear at DJFS for a face-to-face interview and submit to a background

Case No. 20 MO 0012

investigation before the children could share an apartment with him. The record further establishes that R.J. never made himself available to the agency and that Mother's communications with the agency terminated on April 23, 2020.

**{¶69}** Additional evidence of Mother's inability to maintain a stable environment for the children lies in Murphy's testimony that Mother reported nine different employers during the pendency of the juvenile proceedings. Murphy testified that she got a lot of conflicting information from Mother, and Mother never verified her employment, with the exception of paystubs provided by Mother when the children were originally taken into custody by DJFS.

**{¶70}** Mother also failed to maintain consistent communication with her children and the agency after the children were removed from her care. Her pre-March 2020 visits with the children were sporadic, and she opted for brief videos wholly lacking in substance, instead of telephone calls, during the early days of the pandemic. Her last visit with the children was February 26, 2020, and she had not requested visitation with the children since that date.

**{¶71}** As of the date of the hearing, her last contact with the agency was April 23, 2020, when she informed Murphy that she was making arrangements to connect the utilities at the Linden Avenue address. In the three months preceding the hearing, Mother did not contact the agency or seek visitation with the children.

**{¶72}** Of greater import, it is clear that the children's emotional and mental health and physical well-being were in jeopardy when they were in Mother's care. In October of 2018, the children, who ranged in age from three to five, were not toilet-trained and were non-verbal. The boys have benefited from counseling and speech therapy that Mother was either unable or unwilling to arrange. B.R. has been successfully weaned from "heavy medication." By all accounts, the children are flourishing in their current custody arrangements. Murphy and S.E. testified that J.C. III, B.R., and F.R. are virtually unrecognizable from their condition on October 11, 2018.

**{¶73}** Finally, Mother appears to argue that the juvenile court's decision was unreasonable insofar as J.C. II's parental rights were not terminated even though J.C. II was incarcerated during the pendency of the juvenile proceeding. However, unlike Mother, J.C. II appeared at the hearing and testified that he maintained weekly contact

with J.C. III throughout his incarceration and intended to regain custody of his son after his release from prison. Further, the GAL, who sought permanent custody by DJFS for all of the children, predicated her motion on her desire to keep the siblings together, rather than J.C. II's abandonment of the children or inability to care for them after his release from jail.

**{¶74}** Accordingly, we find that the juvenile court did not act unreasonably, arbitrarily, or unconscionably in granting DJFS's motion for permanent custody with respect to B.R. and F.R., and Appellant's second assignment of error has no merit.

## CONCLUSION

**{¶75}** In summary, we find that the juvenile court did not abuse its discretion in declining to continue the hearing, based on Mother's documented history of failing to appear for scheduled appointments with the children, as well as her failure to maintain consistent communication with Murphy and DJFS. We further find that the juvenile court did not err in permanently terminating Mother's parental rights with respect to the children, B.R. and F.R. As a consequence, the judgment entry of the juvenile court if affirmed.

Donofrio, P.J., concurs.

Robb, J., concurs.

Case No. 20 MO 0012

———————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, Juvenile Division, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**